UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

                                                                        12-CR-64 (KAM)

            -against-


YURI BERSHCHANSKY

                                    Defendant.
_____


DEFENDANT'S POST-HEARING BRIEF IN
SUPPORT OF MOTION TO SUPPRESS


Andrey Tikhomirov, Esq.
(AT8276)
1400 Avenue Z, Suite 505
Brooklyn, NY 11235

## TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………………3

SUMMARY OF EVIDENCE………………………………………………………….4

      Defense witness: Marina Bershchanskaya..…………………………….………………4
      Government witness: Special Agent Raab.……………………………..………….....5
      Government witness: Special Agent Bourne…………………………………....…...7

ARGUMENT………………………………………………………………………….10

  I.     Burden of proof…………………………………………………………………10
  II.    Custodial Interrogation……………………………………………….……....…10
  III.   Mr. Bershchansky Was in Custody…………………….……………………….12
  IV.   Mr. Bershchansky Was a Subject of Interrogation..........................................16
  V.    Mr. Bershchansky's Consent to Talk Was Not Voluntary………………….……..16
  VI.   Mr. Bershchansky Was a Subject of Custodial Interrogation ……………….……17

PROBABLE CAUSE FOR SEARCH WARRANT………………………………………17

  VII.  The Affidavit Did Not Establish Probable Cause……………………………….17
  VIII.  Mr. Bershchansky is entitled to a *Franks* hearing…………………………………20

CONCLUSION…………………………………………………………………..21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA                      12-CR-64 (KAM)


                    -against-                  DEFENDANT'S
                                               POST-HEARING BRIEF IN
                                               SUPPORT OF MOTION TO
                                               SUPPRESS

YURI BERSHCHANSKY

                              Defendant.
_____


PRELIMINARY STATEMENT

The defendant, Mr. Bershchansky, by his counsel, respectfully submits the post-hearing

brief following the hearing on defendant's Motion to Suppress Statements and Search Evidence.

This Brief refers to issues raised during the course of this litigation and the evidentiary

hearing in regard to how those issues, and prior rulings, impact on the specific questions relevant

to the resolution of the instant motion.

The facts of the case and the principal arguments of the defendant are set forth in his

Motion to Suppress Statements and Search Evidence, Res. to Def. Mot. of Mar. 30, 2012, Doc.

No. 21, and Reply Affirmation, Res. to Def. Mot. of May. 3, 2012, Doc. No. 26.

Considering the arguments and the evidence offered at the hearing, Mr. Bershchansky

respectfully submits that as his statements were obtained in the result of coercive activity of the

law enforcement agents and in response to custodial interrogation in violation of his

Constitutional rights.

SUMMARY OF EVIDENCE

At the hearing on this motion, the witnesses testified in sum and substance as follows:

**Defense witness: Marina Bershchanskaya**. (See Supp. Hrng. Tr. at 19-83, May 14, 2012).

a. On January 31, 2011, approximately at 6:00 am, Ms. Bershchanskaya opened the door of her residence in response to knocking to the door by federal agents. (Tr. at 20 ¶ 3-25).

b. Without explanation of their visit, the agents asked Ms. Bershchanskaya about whereabouts of her son. (Tr. at 23 ¶ 9-10).

c. Ms. Bershchanskaya saw approximately eight law enforcement agents quickly entered Ms. Bershchanskaya's apartment. There were some men and some women amongst the agents. (Tr. at 43-44).

d. Upon agents' entry, Ms. Bershchanskaya heard that the agents woke up her son, Yury Bershchansky, and ordered him to sit and keep his hands where the agents can see them. (Tr. at 26 ¶ 14-18 and at 28 ¶ 12-20).

e. One agent intentionally blocked Ms. Bershchanskaya's way to the son's bedroom and bathroom. (Tr. at 24 ¶ 8-24).

f. Ms. Bershchanskaya saw Yury Bershchansky in his bedroom sitting on the bed with bare torso and holding hands on his knees. He was surrounded by the agents and looked very frightened. (Tr. at 28 ¶ 5-11 and at 29 ¶ 1-8).

g. Ms. Bershchanskaya saw one agent blocking the door-way to Mr. Bershchansky's bedroom and other agents blocking the exit door to the backyard. (Tr. at 27 ¶ 17-25 and at 29 ¶ 12-16).

h.  Ms. Bershchanskaya saw agents escorting Mr. Bershchansky and physically holding Mr. Bershchansky by the right shoulder and his both hands behind his back. She thought that Mr. Bershchansky was under arrest. (Tr. at 33 ¶ 1-7 and at 60-64).

i.  Ms. Bershchanskaya heard the agent saying to Mr. Bershchansky that he has to answer a couple of questions if he doesn't want to be arrested. (Tr. at 33 ¶ 15-20 and at 65 ¶ 9-16).

j.  One agent told Ms. Bershchanskaya that she is not free to move around in her residence and that she can dress up in her bedroom. (Tr. at 31-32).

k.  Ms. Bershchanskaya was not physically touched in any way by the agents. (Tr. at 74 ¶ 13-14).

l.  Ms. Bershchanskaya was told that she was "free." (Tr. at 34 ¶ 8-9).

m.  Ms. Bershchanskaya saw her son sitting in unusual way in the kitchen surrounded by the agents and questioned. (Tr. at 34-35).

n.  One officer was blocking the exit door from the residence. (Tr. at 36 ¶ 9-17).

o.  Ms. Bershchanskaya saw Mr. Bershchansky being frightened, pale, with shaking hands, shaking chin and trembling voice. Mr. Bershchansky said that he does not know what is going on. (Tr. at 35 ¶ 12- 23).

p.  Mr. Bershchansky did not follow his usual morning routine on that date. (Tr. at 37-38).

**Government witness**: **Special Agent Raab**. (See Supp. Hrng. Tr. at 84-143, May 14, 2012).

a.  On January 31, 2011, approximately at 6:00 am, eight agents including Agent Raab arrived to Mr. Bershchansky's residence for conducting a search. (Tr. at 87 ¶ 15-23).

b.  On the date, Agent Raab was wearing "street clothes", but has no recollection as to the color of a jacket he or the other agents was wearing. (Tr. at 88 ¶ 2-9).

c. After Ms. Bershchanskaya opened the door, Agent Raab identified himself and explained to her the reason for their visit and stated that they need to come in. (Tr. at 90 ¶ 11-17).

d. Upon entering the residence, Agent Raab conducted security sweep search of Ms. Bershchanskaya's bedroom. Agent Raab walked through the bedroom, did not see anything that looked like an obvious safety hazard and left. (Tr. at 94 ¶ 13-18).

e. Agent Raab spend less than a minute to conduct a security sweep in Ms. Bershchanskaya's bedroom. Immediately after the security sweep, Agent Raab went back to the kitchen. (Tr. at 94 ¶ 19-21 and at 139 ¶ 8-24).

f. Agent Raab had no recollection of the bedroom's door or location of the furniture. (Tr. at 126 ¶ 23-25 and at 138 ¶ 20-24).

g. Agent Raab did not know what happened in Mr. Bershchansky's bedroom. (Tr. at 122-123).

h. In the kitchen he saw Mr. Bershchansky. Agent Raab had no recollection as to who and when brought Mr. Bershchansky to the kitchen. (Tr. at 102 ¶ 5-22).

i. Agent Raab came into the kitchen after Mr. Bershchansky was already there. (Tr. at 124-125 and at 142 ¶ 3-11).

j. Mr. Bershchansky was not acting in a hostile manner. (Tr. at 129 ¶ 2-3).

k. Agent Raab had no recollection as to how many agents were present in the kitchen when Agent Raab walked into the kitchen. (Tr. at 139-140 and at 142 ¶ 12-15).

l. In the kitchen, Agent Raab together with Agent Bourne conducted interview of Mr. Bershchansky. (Tr. at 103 ¶ 13-14).

m. Agent Raab and Agent Bourne identified themselves to Mr. Bershchansky and explained to him that they have a search warrant and he is not under arrest. (Tr. at 103-104).

n. Mr. Bershchansky appeared to understand. (Tr. at 105 ¶ 1-17).

o. Agent Raab planned to ask Mr. Bershchansky questions prior to executing the search warrant. (Tr. at 135 ¶ 3-7).

p. Agent Raab did not indicate to Mr. Bershchansky that he had to talk to the agents. Agent Raab did not hear any other agents tell Mr. Bershchansky that he had to talk to the agents. (Tr. at 104 ¶ 20-22).

q. Agent Raab together with Agent Bourne conducted interview of Mr. Bershchansky for the period of time about 45 minutes to an hour. (Tr. at 108 ¶ 1).

r. During the interview, Agent Raab was not facing and could not see the front exit door from Mr. Bershchansky residence. (Tr. at 134 ¶ 10-20).

s. Mr. Bershchansky did not indicate at any point that he wanted the interview to end. (Tr. at 108 ¶ 11-13).

t. Agent Raab overheard that Ms. Bershchanskaya addressed Mr. Bershchansky in Russian. Agent Raab does not understand Russian. Russian-speaking agent was not present in the kitchen and was not involved in the interview at all. (Tr. at 110-112).

u. Agent Raab asked Ms. Bershchanskaya if she needed to go to work and that she is "free to go." (Tr. at 107 ¶ 13-14).

v. Agent Raab did not testify as to whether he advised Mr. Bershchansky that Mr. Bershchansky is "free to go."

**Government witness**: **Special Agent Bourne**. (See Supp. Hrng. Tr. at 144-159, May 14, 2012).

a. On January 31, 2011, approximately at 6:00 am, Agent Bourne participated in a search of the residence of Mr. Bershchansky. (Tr. at 146 ¶ 9-19).

7

b.   Agent Bourne was wearing "street clothes". She did not describe the color of a jacket she was wearing. (Tr. at 147 ¶ 6-23).

c.   Upon entry the residence, Agent Bourne moved though the house conducting a security sweep. Agent Bourne does not remember areas where she had conducted the security sweep. (Tr. at 162-163).

d.   After security sweep, Agent Bourne entered Mr. Bershchansky's bedroom. There were other agents already present in Mr. Bershchansky's bedroom. (Tr. at 148 ¶ 4-5).

e.   Agent Bourne had no recollection as to how many agents were in Mr. Bershchansky's bedroom, and what were they or Mr. Bershchansky doing at the time of her entry. (Tr. at 164 ¶ 16-22).

f.   Agent Bourne had no recollection as to whether anyone talked to Mr. Bershchansky prior to her entry to the bedroom. (Tr. at 166 ¶ 15-17).

g.   Mr. Bershchansky appeared to be emotionless and not hostile. (Tr. at 166 ¶ 11-14).

h.   After Mr. Bershchansky got dressed, Mr. Bershchansky was told that everything will be explained to him if he would step down to the kitchen and talk to them. (Tr. at 148 ¶ 14-18).

i.   Agent Bourne has no recollection as to who said it to Mr. Bershchansky. (Tr. at 148 ¶ 19-23).

j.   Agent Bourne did not tell Mr. Bershchansky that he had to answer questions. Agent Bourne did not hear any agents tell Mr. Bershchansky that he had to answer questions. (Tr. at 151 ¶ 1-16).

k.   Agent Bourne spent between five and ten minutes with Mr. Bershchansky in his bedroom before they went down to the kitchen. (Tr. at 170 ¶ 7-19).

8

l.   Agent Bourne together with another agent guided Mr. Bershchansky to the kitchen. She does not remember specifically whether any officer physically touched Mr. Bershchansky (Tr. at 152 ¶ 17-21).

m.   Agent Bourne has no recollection as to identity of another agent escorting Mr. Bershchansky. (Tr. at 173 ¶ 5-8).

n.   Agent Bourne has no recollection as to whether she was in front or in the back of Mr. Bershchansky during his escort. Agent Bourne has no recollection as to whether the other agent was in front or in the back of Mr. Bershchansky during his escort. (Tr. at 167 ¶ 6-11).

o.   In the kitchen, Agent Raab and Agent Bourne identified themselves to Mr. Bershchansky and explained to him that he was not under arrest and asked if he would be willing to speak. (Tr. at 154 ¶ 10-16).

p.   Mr. Bershchansky indicated that he understood. (Tr. at 154 ¶ 22-25).

q.   Agent Bourne had no recollection as to whether she or any other agent said to Mr. Bershchansky that he is "free to go." (Tr. at 177 ¶ 2-7).

r.   Mr. Bershchansky did not indicate at any point that he wanted the interview to end. (Tr. at 155 ¶ 4-11).

s.   During the interview, Agent Bourne was sitting facing the front exit door. (Tr. at 178 ¶ 11-18).

t.   Mr. Bershchansky was sitting in the chair between the wall and the exit door. (Tr. at 176 ¶ 18-25).

u.   Mr. Bershchansky did not use a bathroom until after the interview. (Tr. at 158 ¶ 21-25).

ARGUMENT

## I.     Burden of proof.

In a motion to suppress evidence, the burden of proof is on the defendant who seeks the suppression. *United States v. Feldman,* 606 F.2d 673 (6th Cir. 1979).  Once the defendant has established some basis for the motion then the burden shifts to the government to show that the search was lawful. *United States v. Sacco,* 563 F.2d 552 (2d Cir. 1977). The standard of proof in this regard is a preponderance of evidence. *United States v. Matlock,* 415 U.S. 164 (1974).

As the moving party, the defendant has satisfied the burden of establishing factual issues necessary to resolve the motion by a preponderance of the evidence.

The Government failed to prove by preponderance of the evidence that Mr. Bershchansky was not in custody when he was interrogated by the agents and that Mr. Bershchansky consented to speak voluntary and not under coercion or duress.

## II.    Custodial Interrogation.

At issue was whether Mr. Bershchansky was in custody during execution of the search warrant and his "seizure" was reasonable under the Fourth Amendment.

A detention during a so-called "Terry stop" or an execution of a search warrant for less than ten minutes may be considered as a reasonable seizure under the Fourth Amendment  *Terry v. Ohio*, 392 U.S. 1 (1968); *Michigan v. Summers,*  452 U.S. at 692 (1981). These cases recognize that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity. Furthermore, most detentions that occur during the execution of a search warrant, like most Terry stops, are "comparatively

nonthreatening." They are often short in duration. Moreover, such detentions are "surely less intrusive than the search itself." *United States v. Burns,* 37 F.3d 276 (7th Cir. 1994).

They are consistent with the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause. *Id.*

In order to protect a citizen's right against self-incrimination guaranteed by the Fifth Amendment, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436 (1966), that suspects must be read certain warnings before they are subjected to "custodial interrogation." *Id.* at 444. A suspect must be both "in custody" and subject to "interrogation" to trigger the Miranda warnings requirement. A person is in custody for purposes of Miranda if that person is either formally arrested or has suffered a " 'restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121 (1983); *Oregon v. Mathiason*, 429 U.S. 492 (1977). In determining whether a suspect is in custody, courts look at "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S.420 (1984). This determination is based on the "totality of the circumstances." *United States v. Fazio*, 914 F.2d 950 (7th Cir.1990).

The test for determining whether a seizure has occurred for purposes of the Fourth Amendment is expressed in objective terms: "[A] person has been "seized" within the meaning of the Fourth Amendment ... only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."*Michigan v. Chesternut*, 486 U.S. 567 (1988); *United States v. Mendenhall*, 446 U.S. 544 (1980).

Furthermore, the test for determining whether a suspect is "in custody" is an objective one; the subjective views of either the officer or the suspect are irrelevant. *United States v. Kirsteins*, 906 F.2d 919 (2d Cir. 1990). As the Second Circuit has explained, this test is two-fold:

(i) it must be determined whether an objectively reasonable person in the defendant's shoes would have thought he or she was free to leave, and if not, (ii) whether an objectively reasonable person "would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004).

 "[T]his inquiry is highly fact-specific and requires a court to view the facts and circumstances confronting the individual in their totality, certain factors have emerged as being probative of whether a reasonable person would have felt free to leave," United States v. McArthur, 6 F.3d 1270 (7th Cir.1993). These include: …whether the police informed the person that she was free to leave; whether police indicated to the person that she was the specific target of police investigation; and whether there was physical touching, or other threatening behavior on the part of police that would communicate to a reasonable person that she was not free to end the encounter. *See id.*

## III.    Mr. Bershchansky Was in Custody.

The specific facts of this case do suggest that Mr. Bershchansky was in custody for Miranda purposes when the officers spoke with him. Based on the totality of the circumstances, Mr. Berschansky's detention was a significant restraint on his liberty which was surely more intrusive than the search itself.

 (i) There is no question as to whether an objectively reasonable person in the defendant's shoes would have thought whether he or she was free to leave, to wit:

    a.  Mr. Bershchansky was woken up at 6 o'clock in the morning by shouting of federal agents and flashing of their flash-lights.

    b.  He did not voluntary open the door or let the federal agents into his residence.

    c.  Mr. Bershchansky was surrounded by federal agents at all times during the search and questioning.

    d.  Mr. Bershchansky could not freely move inside of his apartment.

    e.  Mr. Bershchansky's access to the exit door was blocked by the federal agent.

    f.  The agents did not give a search warrant to Mr. Bershchansky until after they had searched the residence and finished their questioning.

    g.  Finally, although Mr. Bershchansky was assured that he is not under formal arrest, he was never advised by the agents that he is free to go. His mother, however, was.

(ii) With regard to the second part of the test, unrebutted testimony of the defendant's witness supports the clear inference that an objectively reasonable person "would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest," to wit:

    a.  Mr. Bershchanskaya was under impression that her son was under arrest.

    a.  Mr. Bershchansky was given orders to sit on his bed and keep his hands in certain position restraining freedom of his movement.

    b.  Without reasonable purpose, Mr. Bershchansky was escorted inside of his own residence with one agent holding Mr. Bershchansky's hands behind his back.

    c.  During the escort, at least one federal agent had made a comment regarding possible arrest if Mr. Bershchansky refuses to answer the questions, creating an atmosphere of "compelling influence."

    d.  Mr. Bershchansky's extensive questioning occurred in earlier morning when it was still dark outside, and it occurred in an "inherently coercive" environment while the government agents were searching his residence.

e.  Mr. Bershchansky appeared very intimidated by the environment during the interrogation, and he neither followed his usual morning routine nor used a bathroom until after the interview on that date.

f.  Unlike in *Burns*, *Summers* or *Terry*, Mr. Bershchansky was not detained for less than ten minutes. According to the agent's testimony, Mr. Bershchansky was detained for the entire search period of time approximately 45 minutes to an hour. The agent's questioning was extensive in scope and duration.

g.  The Government expended considerable energy seeking to prove that Mr. Bershchansky has "never been handcuffed." However, the Government introduced no evidence as to what was actually happened or said to Mr. Bershchansky in the first very important minutes of government agents' presence inside the the Mr. Bershchansky's bedroom, as well as who actually escorted Mr. Bershchansky to the kitchen and the manner of his escort. Agent Raab did not see or hear what happened to Mr. Bershchansky until he met Mr. Bershchansky in the kitchen already being accompanied by Agent Bourne. Likewise, Agent Bourne did not know or hear what happened in the bedroom prior her entry. Obviously, she could not credibly testify as to what happened between the other agents and Mr. Bershchansky prior her entry. The total lack of the government's evidence as to what happen or was said to Mr. Bershchansky prior Agent Bourne entered his bedroom nullifies the significance of the government's "never been handcuffed" argument. In fact, the principal witness in this regard was Ms. Bershchanskaya, who saw the flash-lights pointed to Mr. Bershchansky's face and heard agent's direct order to "sit and place his hands" in certain way given to Mr. Bershchansky.

h.  Furthermore, Agent Bourne, who allegedly escorted Mr. Bershchansky together with another agent from the bedroom, had no recollection as to whether she or that agent was actually in front or in the back of Mr. Bershchansky during his escort. Obviously, she could not credibly testify as to whether the other agent held Mr. Bershchansky's hands or not. Again, the principal credible evidence relating to the issue is testimony of Ms. Bershchanskaya, who saw agents restricting movement of Mr. Bershchansky by physically holding his hands behind his back. She also heard that the agent told Mr. Bershchansky that he has to answer a couple of questions if he doesn't want to be arrested. No evidence to the contrary was presented by the government.

i.  It is true that where a lawful investigatory detention is in progress, an officer may conduct a protective guiding or restraints of the suspect so long as he or she reasonably suspects that a detainee represents safety hazards. *United States v. Colon*, 250 F.3d 130 (2d Cir. 2001). However, if the officer clearly does not suspect that the suspect represents safety hazards continued physical restraints results in unlawful arrest of the suspect. Here, both agents testified that Mr. Bershchansky was calm, emotionless, and non-hostile during the search. According to both agents' testimony, they had no an articulable basis for suspecting immediate criminal activity or safety hazards of Mr. Bershchansky. Yet, one of the agents physically restrained Mr. Bershchansky and held his hands behind his back during the escort. Thus, it would have been unconstitutional for the agents to escort Mr. Bershchansky by physically holding Mr. Bershchansky's hands behind his back. No reasonable person would have considered himself as being free to leave while being physically escorted by the

law enforcement agent inside own residence following the orders to sit and keep the hands in certain way.

j.   Apparently, Mr. Bershchansky's post-escort statements in the kitchen were made immediately after and as a result of his bedroom's arrest.

k.   Finally, Mr. Bershchansky was placed on the chair in the middle of the kitchen between two interrogating officers. According to the agent's testimony, Agent Raab was not faced and could not see the exit door, while Agent Bourne was facing the exit door during the interview, and no other agents were standing next to the exit door. At the same time, six other law enforcement officers were conducting the search of only one bedroom apartment. This testimony, even if credited, clearly establishes that during entire interrogation, Mr. Bershchansky was placed between the agents Raab and Bourne, which only proves that at least one of the interrogating agents was between Mr. Bershchansky and the exit door blocking his way out.

**IV.   <u>Mr. Bershchansky Was a Subject of Interrogation</u>.**

The totality of the circumstances which occurred immediately prior and during the alleged interview clear indicates that Mr. Bershchansky was subject of interrogation, to wit:

a.   Mr. Bershchansky did not voluntary initiated the conversation with the federal agents.

b.   Mr. Bershchansky was subject of extensive unlimited questioning.

c.   The alleged interview consisted of specific questions of an incriminating nature.

d.   The agents had intent and planed to question Mr. Bershchansky prior to conducting search in his residence.

**V.   <u>Mr. Bershchansky's Consent to Talk Was Not Voluntary</u>.**

The totality of circumstances supports that the agents did not obtained Bershchansky's voluntarily consent to speak. Verbal restraints inside the bedroom and physical restraints during the escort, as well as the agent's comments regarding the arrest of Mr. Bershchansky if he refuses to answer the questions had created an atmosphere of coercive and "compelling influence."

## VI.    Mr. Bershchansky Was a Subject of Custodial Interrogation.

A reasonable person in Mr. Bershchansky's position would have understood this situation as a "restraint on freedom of movement' of the degree associated with a formal arrest." Under the circumstances, no reasonable person would have felt free to end the encounter. This was a horrifying event for Mr. Bershchansky and at no point did he ever feel free or safe. During the entire interrogation Mr. Bershchansky was placed in an atmosphere of compelling influence and was a subject of an extensive interrogator's pressure. He was both "in custody" and subject to "interrogation", requiring protection of his right against self-incrimination guaranteed by the U.S. Constitution.

PROBABLE CAUSE FOR SEARCH WARRANT

Mr. Bershchansky respectfully submits that in order to be sustainable, a search warrant affidavit has to set forth the actual SHA-1 values that were on the computer files in the defendant's computer, as compared to the SHA-1 the values of digital files obtained from other source.

## VII.    The Affidavit Did Not Establish Probable Cause.

Mr. Bershchansky respectfully submits that analogous to the instant motion, in *United States v. Schimley,* 2009 WL 5171826 (U.S. District Court for the Northern District of Ohio

2009), SHA values played a similar role in a defense motion challenging some aspect of the prosecution.

Although, in *Schimley, supra,* the judge denied defendant's motions to suppress and for a *Franks* hearing because she held that the defendant hadn't shown the false statements were knowingly or recklessly included in the affidavit, it seems to suggest the warrant in this case would have been supported by probable cause only if the agent had specifically described the matching SHA hash values.

Under Supreme Court precedent, the Court may not rely upon information outside the four corners of the affidavit in its probable cause determination. *Whiteley v. Warden, Wyoming State Penitentiary,* 401 U.S. 560 (1971).

In *Schimley, supra*, the government claimed that the SHA value of the downloaded file matched that of the file being shared at defendant's IP address. The defendant stated that whether the SHA values match is an issue of fact only a *Franks* hearing can resolve, and that the Court cannot simply rest on the Government's assertion that the files did in fact match.

The judge agreed that the probable cause determination had to be based on what was in the affidavit but still rejected Schimley's argument: "The Court ruled the way it did, not because the government claimed that the SHA values matched, but because the defendant was unable to meet his burden." *See Schimley, supra*.

In the instant case, similar to *Schimley*, the affiant had never downloaded any files from Mr. Bershchansky's computer, never saw or opened any files from Mr. Bershchansky's computer prior to the search.

Moreover, the affiant had not even compared himself any SHA values of the files from Mr. Bershchansky's computer.

Instead, the affiant simply stated that the files in Mr. Bershchansky's computer were compared by some unidentified source with the files obtained from other unidentified sources.

The affiant expended considerable energy and time describing significance of SHA values and how these values can be identified and compared.

The affiant even presented examples of SHA values which were made up of groups of numbers and letters, but which had no connection to Mr. Bershchansky what so ever.

Then the affiant mysteriously stated that the computer files in Mr. Bershchansky's computer were found to be the same as the files obtained from other sources by comparing actual SHA values of said files.

Logically, before comparing any characteristics, a reasonable person, usually needs to obtain the characteristics in issue first. In our scenario, the affiant should have, at least, indicated what "numbers and letters" he used before using these values for comparison with other SHA values.

Instead, the affiant blatantly stated that these SHA values were used for downloading files from other sources with the identical SHA value which were late verified. No actual "numbers and letters" or other description of comparable units were ever provided to the magistrate. Was the affiant comparing numbers with letters, zeroes with o's (lowes case letter O) or ones with and l's (lower case letter L)?

A careful reading of the affidavit proves it to be fatally lacking in probable cause. The affidavit obviously fails logical analysis, as a man of reasonable prudence, first, would have obtained and describe the actual characteristics before its comparison. No subject matter of comparison was ever presented to the magistrate.

The only way for the government to verify that the files to be found on the premises were identical to the files described in the affidavit was through comparing actual "numbers and letters" of these files. But inexplicably, the government decided that the magistrate does not need to know said values.

Furthermore, the affiant was familiar with findings of *United States v. Voustianiouk*, 2009 WL 2390246 (S.D.N.Y 2009), when the same affiant signed an affidavit in support for a warrant to search, which was found insufficient to establish probable cause. *Id*.

As a result, the affiant was on notice that his prior affidavit was insufficient to establish probable cause.

However, similar to *Voustianiouk,* in the instant matter, the affiant did not describe content of the files in Mr. Bershchansky's computer. Similar to *Voustianiouk*, the affiant did not make clear which categories of sexually explicit conduct was in Mr. Bershchansky's files. *Id*. Obviously, he could not do it because he did not append, downloaded, viewed, or opened any files from Mr. Bershchansky's computer. Instead, he mislead the magistrate by describing content of the files obtained from other sources which were mysteriously compared to Mr. Bershchansky's files.

Moreover, here, the affiant was not even care of providing description of the source of his information, as he did in *Voustianiouk,* where such information was, at least, "known to German law enforcement." *See id*.

VIII. **Mr. Bershchansky is entitled to a *Franks* hearing.**

In *Franks v. Delaware*, 438 U.S. 154 (1978), the United States Supreme Court determined that a defendant who specifically alleges that a search warrant is based on an

affidavit containing material misrepresentations or omissions is entitled to a hearing to present evidence in support of those allegations.

Accordingly, it is respectfully submitted as follows:

(1) The affiant deliberately omitted the actual SHA values of Mr. Bershchansky's files described in the affidavit and misrepresented that these values were compared with the values of the files from other sources. In fact, to date, there is no single evidence showing that the files described in the affidavit were ever discovered during the search. Inexplicably, the government's formal accusations were based on descriptions of the files entirely different from the files described in the affidavit.

(2) The affiant knew that failure to describe content of Mr. Bershchansky's files would have been insufficient to establish probable cause, instead he mislead the court by describing content of the files obtained from other sources but not of Mr. Bershchansky's files.

(3) The affiant entirely omitted the source of information that Mr. Bershchansky's files were known to be associated with unlawful content, and attempted to substitute the requirement of describing categories of Mr. Bershchansky's files content by false connection between the alleged SHA value comparison with content of the files from other sources;

## CONCLUSION

a. Mr. Bershchansky's statements obtained in violation of his right against self-incrimination guaranteed by the U.S. Constitution should be suppressed;

b. The search warrant should be vacated and all evidence seized pursuant to illegally obtained and invalid warrant should be suppressed. In the alternative, Mr. Bershchansky is entitled to a hearing to present evidence in support that the information supplied to the

judge issuing the warrant was false and inaccurate and that the search warrant was

unlawfully obtained.

Dated: Brooklyn, NY
       June 26, 2012

                                           Respectfully submitted

                                           _____
                                           Andrey Tikhomirov, Esq.
                                           (AT8276)
                                           1400 Avenue Z, Suite 505
                                           Brooklyn, NY 11235
                                           Tel: (718) 376-9500

CERTIFICATE OF SERVICE

I certify that on June 26, 2012, I electronically filed the foregoing with the Clerk of the

Court by using the CM/ECF system.

/s/ _____

                Andrey Tikhomirov, Esq.
                (AT8276)
                Attorney for Defendant