UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------
UNITED STATES


-against-                                   MEMORANDUM AND ORDER


YURI BERSHCHANSKY,                          12-CR-00064 (KAM)


                    Defendant.
----------------------------------------

**MATSUMOTO, United States District Judge:**

        Pending before the court is Defendant Yuri

Bershchansky's ("defendant," or "Mr. Bershchansky") motion to

suppress (i) evidence seized pursuant to a search warrant

executed on January 31, 2011, and (ii) statements made by the

defendant on January 31, 2011, during the execution of the

search warrant.  Mr. Bershchansky is charged with possession of

child pornography, in violation of 18 U.S.C. § 2252(a)(4)(b) and

18 U.S.C. § 2252(b)(2).  (ECF. No. 7, Indictment, filed

1/20/2012.)  For the reasons discussed below, defendant's motion

to suppress evidence seized and statements obtained pursuant to

a search warrant executed on January 31, 2011, is granted.

                        **BACKGROUND**

**A.    The Search**

        On November 23 and 24, 2010, an investigator from the

United States Department of Homeland Security, Homeland Security

Investigations ("HSI") used file sharing software to connect directly to a computer with Internet Protocol ("IP")[1] address 24.185.53.197, which was offering files for sharing on the Gnutella 1 peer-to-peer file sharing network.[2]  (ECF No. 1, Supporting Affidavit, No. 11-mj-0068(JMA), filed 1/24/2011 ("Supporting Aff."), ¶ 15.)  The investigator identified numerous files offered for download by that computer with file names indicative of child pornography.  (*Id.* ¶ 16.)  The investigator determined the unique Secure Hash Algorithm Version 1 ("SHA1") value for each of those files and subsequently downloaded documents with identical SHA1 hash values from multiple sources.[3]  (*Id.* ¶ 17.)  After viewing the downloaded files, Special Agent Robert Raab ("Agent Raab") confirmed that they depicted images of child pornography.  (*Id.* ¶ 17.)  Agent

---

[1] An IP address is a unique number used by a computer to access the Internet. (Supporting Aff. ¶ 5(i).)

[2] Peer-to-peer file sharing is a method of communication available to Internet users whereby various computers form a network and use specially designed software programs to access the network.  (Supporting Aff. ¶ 6.)  Peer-to-peer software programs are designed to allow users to trade digital files through the network.  (*Id.*)  The most predominant peer-to-peer file sharing network is the Gnutella 1 network, which can be accessed by using various software programs such as Limewire.  (*Id.*)

[3] The SHA1 value is the fingerprint or digital signature of a digital file. (Supporting Aff. ¶ 11.)  Special Agent Robert Raab's ("Agent Raab") affidavit explains that "[b]y comparing the SHA1 values of two files, one can conclude that two files are or are not the same with a precision of 99.9999 percent certainty.  I am aware of no documented occurrences of two different files being found on the Internet having different content while sharing the same SHA1 value.  The use of SHA1 values to match movies and images has proven to be extremely reliable."  (*Id.* ¶ 12); *see also United States v. Finley*, 612 F.3d 998, 1000 n.3 (8th Cir. 2010) ("The SHA is a mathematical algorithm that allows for unique identification of digital images and videos. SHA values are, in essence, unique digital fingerprints or signatures.").

Raab subsequently confirmed that IP address 24.185.53.197 was registered to cable provider Cablevision, and that the subscriber to IP address 24.185.53.197 during the relevant time frame was Mr. Bershchansky. (*Id.* ¶ 19.) Cablevision provided defendant with internet access to/from his physical address at 2462 Gerritsen Avenue in Brooklyn, New York, 11229. (*Id.*) As discussed below, Cablevision identified defendant as a resident of Apartment 2, although the door to his apartment is marked "1."

On January 24, 2011, Agent Raab submitted an Affidavit In Support of a Search Warrant asserting that there was probable cause to search for "evidence or instrumentalities of the possession, transportation, receipt, distribution and reproduction of sexually explicit material relating to children, in violation of [18 U.S.C. §§ 2252 and 2252A]," concealed within the "premises known and described as 2462 Gerritsen Avenue, Apt. #2, Brooklyn, New York 11229." (Supporting Aff. at 1.) Agent Raab stated in the supporting affidavit that the IP address for Cablevision was subscribed to by "Yuri Bershchansky of 2462 Gerritsen Avenue Apartment 2," that Con Edison confirmed that the bill for the subject premises was in the name of "Yuri Bershchansjy [sic]," and that "the tenant living at 2462 Gerritsen Avenue Apartment 1 stated that 'Yuri and his mother live in apartment 2.'" (*Id.* at ¶¶ 19-20.) The same day,

Magistrate Judge Joan M. Azrack signed a search warrant

authorizing the search of 2462 Gerritsen Avenue, Apartment #2,

Brooklyn, New York 11229. (ECF No. 1, Complaint, dated

12/19/2011 ("Compl.") ¶ 7; ECF No. 22, Gov't Opposition to

Def.'s Motion to Suppress, dated 4/13/2012 ("Opp."), at 10.)

On January 31, 2011, Department of Homeland Security

agents, including Agent Raab, executed the search warrant on

defendant's residence, located at 2462 Gerritsen Avenue,

Apartment #1, Brooklyn, New York 11229. (Compl. ¶ 7.) The

search warrant bore the caption "In the Matter of the Search of

The Premises Known and Described as 2462 Gerritsen Avenue, Apt.

#2, Brooklyn, NY 11229." (ECF No. 2, Search Warrant, No. 11-mj-

0068(JMA), filed 1/24/2011 ("Search Warrant") (capitalization

altered).) The search warrant also provided the following

description for the premises to be searched:

> The SUBJECT PREMISES is an apartment located
> within a two-story red brick multi-family
> dwelling, which is attached on one side.
> The front of the dwelling has two exterior
> doors. The door to the left leads upstairs
> to apartment #1. The door to the right as
> you face the building leads to the SUBJECT
> PREMISES. The door is brown and bears the
> number "2462 2".

(Search Warrant at 1.) Although the search warrant's caption

referred to "Apt. #2" and its description of the premises to be

searched also referred to a door bearing the numbers "2462 2,"

the search warrant was in fact executed on *apartment #1*, which

is defendant's apartment, the exterior door to which was marked with a "1." (Government Exhibit ("Gov. Ex.") 2-E; ECF No. 21-1 to 21-4, Affidavit of Marina Bershchanskaya, dated 3/27/12 ("Bershchanskaya Aff.").)

According to the government, the agents knocked on the door of Apartment #1, identified themselves to defendant's mother and informed her of the search warrant. (ECF No. 22-3, Homeland Security Investigators' Search Report ("HSI Search Report").) The defendant's mother then allowed the agents to enter the residence. (*Id.*) The agents went to defendant's bedroom, identified themselves, and notified defendant of the search warrant; defendant responded that he understood. (*Id.*)[5] The agents allowed defendant to dress, then asked defendant if he would be willing to be interviewed. (*Id.*) Defendant stated that he would and went into the kitchen with some of the agents. (*Id.*) The agents advised defendant that he was not under arrest, that he was under no obligation to speak with law enforcement and that he was free to leave. (Compl. ¶ 8; HSI Search Report; 5/14/12 Tr. at 104-105.) The government asserts that defendant was not handcuffed or restrained in any way. (Opp. at 12; HSI Search Report.) Two agents interviewed

---

[5] Agent Raab later testified at a hearing held on May 14, 2012 that he did not give defendant's mother a copy of the search warrant when the agents arrived. Nor did the agents provide defendant with a copy of the search warrant prior to their interview of the defendant; instead, Agent Raab gave defendant a copy of the search warrant "before [the agents] left." (Transcript of Suppression Hearing held on May 14, 2012 ("5/14/12 Tr.") at 118.)

defendant while the other agents searched the apartment. (HSI Search Report.) During the course of the interview, defendant unambiguously admitted to receiving and possessing child pornography. (*Id.*)

According to defendant's mother, the agents did not inform her of the search warrant when they first arrived at defendant's residence. (Bershchanskaya Aff. ¶¶ 25-26.) Defendant's mother also saw defendant "being escorted by two officers to the kitchen, with one officer holding [defendant's] hands behind his back," and "heard that the officer said that [defendant] has to answer some questions." (Bershchanskaya Aff. ¶¶ 18-19.) In addition, defendant's mother later saw defendant "sitting in the middle of [the] kitchen in the chair usually standing next to the wall. One officer was standing right behind the chair and two officers sitting right [in front] of [defendant] asking him questions." (*Id.* ¶ 22.)

A preliminary forensic review of defendant's seized computer equipment revealed more than 100 videos containing child pornography. (Compl. ¶ 9; Opp. at 14.) In addition, the same files that the investigator had previously browsed on defendant's computer through the Gnutella 1 peer-to-peer file sharing network were subsequently found on defendant's computer, which was seized during the search executed on January 31, 2011. (Opp. at 26.) On December 19, 2011, Magistrate Judge Robert M.

Levy signed an arrest warrant for defendant for violating 18
U.S.C. § 2252.  (ECF No. 2, Arrest Warrant, filed 12/19/2011.)
On December 21, 2011, agents executed the arrest warrant at
defendant's home.  (Opp. at 15.)  Defendant was advised of and
waived his *Miranda* rights.  (*Id.*; ECF No. 22-4, Arrest Report.)
The Indictment was filed on January 20, 2012.  (ECF No. 7,
Indictment.)

    **B.   Defendant's Motion to Suppress**

        On March 30, 2012, defendant moved to suppress (i)
evidence seized pursuant to the search warrant executed on
January 31, 2011, arguing that there was no probable cause for
the search warrant and that the affidavit on which it was based
omitted necessary information; and (ii) his pre-arrest
statements, arguing that they were obtained in violation of his
rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  (*See
generally* ECF No. 21, Def.'s Motion to Suppress, dated 3/30/2012
("Mot.").)

        On April 13, 2012, the government filed its opposition
to defendant's motion to suppress.  (Opp.)  The defendant filed
a reply to the government's opposition on May 3, 2012.  (ECF No.
26, Def.'s Reply in Support of Motion to Suppress, dated
5/3/2012 ("Reply").)

        At the parties' request, on May 14, 2012, the court
held a hearing on defendant's motion to suppress.  Agent Raab

and the defendant's mother, Marina Bershchanskaya, both testified at the hearing. (Minute entry dated 5/15/2012 for proceedings held on 5/14/2012.) As discussed in greater detail below, Agent Raab credibly testified about the facts establishing the probable cause for the search warrant and the circumstances under which Mr. Bershchansky agreed to answer questions during the search.

The parties submitted post-hearing briefs after the May 14, 2012 suppression hearing that addressed the testimony given at the hearing. (ECF Nos. 32-34.) Notably, at the May 14, 2012 suppression hearing, defense counsel had asked Agent Raab if he recalled what apartment number the warrant was directed to, and Agent Raab responded "I believe the warrant had Apartment Number 2." (5/14/12 Tr. at 116.) Defense counsel then asked Agent Raab if he knew the number of the apartment that government had searched, and Agent Raab replied "I believe it's Apartment 1." (*Id.* at 117.) Agent Raab also testified at the May 14 hearing that he had looked at the search warrant prior to entering the apartment and believed the warrant listed Apartment 2. (*Id.* at 118-119.) In response to defense counsel's query why Agent Raab went to Apartment 1, Agent Raab testified that he "didn't realize that" the warrant did not list Apartment 1, and admitted that "it should have read No. 1." (*Id.* at 119.)

On August 1, 2012, the court ordered additional
briefing from the parties addressing the effect of the Second
Circuit's decision in *United States v. Voustianiouk*, 685 F.3d
206 (2d Cir. 2012), decided after defendant's May 14 hearing, on
the instant motion.  (Docket entry dated 8/1/12.)  The
*Voustianiouk* case involved a search warrant authorizing the
search of premises other than the premises that the agents
actually searched, which resulted in suppression of both the
defendant's statements and evidence seized.  As noted above,
although the search warrant at issue in this case authorized the
search of "The Premises Known and Described as 2462 Gerritsen
Avenue, *Apt. #2*, Brooklyn, NY 11229," (Search Warrant at 1
(emphasis added)), the testimony at the May 14, 2012 hearing
established that the agents actually entered and searched
*Apartment 1* of 2462 Gerritsen Avenue, which is, in fact,
defendant's apartment.  The court's August 1, 2012 order also
set a status conference for September 6, 2012 to address any
additional issues that might be raised in the parties'
supplemental briefing.  (*Id.*)

Pursuant to the court's August 1, 2012 order, Mr.
Tikhomirov (defendant's former attorney) and the government
filed supplemental submissions regarding the *Voustianiouk* case.
(ECF No. 35, Letter Brief Regarding *Voustianiouk*, filed
8/10/2012 ("First Suppl. Mot."); ECF No. 36, Gov't Opposition

Regarding *Voustianiouk*, filed 8/20/2012 ("First Suppl. Opp.");
ECF No. 37, Def.'s Reply Regarding *Voustianiouk* ("First Suppl.
Reply").)

Of particular note, on August 10, 2012, Mr. Tikhomirov
submitted an Affidavit from Svetlana Klishina dated August 9,
2012 in connection with his supplemental submission regarding
*Voustianiouk*. (ECF No. 35-1, Affidavit of Svetlana Klishina
dated 8/9/12 ("Klishina 8/9/12 Aff.").) Ms. Klishina averred in
her Affidavit that she and her family had occupied Apartment 2
of 2462 Gerritsen Avenue since 2003. (*Id*. ¶ 3.) According to
Ms. Klishina's Affidavit, "[o]ne day, approximately two years
ago," she overheard a conversation between federal agents and
her then-teenaged daughter, Anna, in which the federal agents
asked if an Asian person named "Kim" lived in her Apartment.
(*Id*. ¶¶ 6-11.) Ms. Klishina averred that at no time did the
agents inquire about someone named "Yury." (*Id*. ¶¶ 21-23.)

On September 6, 2012, the court held a status
conference to discuss the parties' supplemental briefing
regarding the impact of *Voustianiouk*. (Minute entry dated
9/7/12.) The court ordered the parties to submit any
photographs and documentation regarding the appearance of the
exterior of defendant's apartment building and doors on the date
the warrant was executed, and also scheduled an additional
hearing date for September 24, 2012. (Minute entry dated

9/7/2012.) Mr. Tikhomirov requested a further hearing to re-examine Agent Raab regarding his knowledge of the defendant's apartment number and to present testimony by Ms. Klishina, the neighbor who lives upstairs from defendant's apartment and who averred that her daughter was interviewed by Agent Raab prior to the search. (Transcript of Status Conference held on 9/7/2012, at 6-8, 20-12; *see also generally* Klishina 8/9/12 Aff.)

On September 19, 2012, Mr. Tikhomirov informed the court via letter that Mr. Bershchansky intended to relieve him as counsel. (ECF No. 38, Letter re: Photo Submission as to Yuri Bershchansky, dated 9/19/12.) The court converted the September 24, 2012 hearing date to a status conference to address the appointment of new counsel for the defendant. (Minute Entry dated 9/19/2012.)

At the September 24, 2012 status conference, the court relieved Mr. Tikhomirov as defense counsel and appointed Harry Batchelder, Esq. as CJA counsel for defendant. (Minute Entry dated 9/25/2012.) As new counsel for Mr. Bershchansky, Mr. Batchelder requested the opportunity to submit his own additional briefing regarding *Voustianiouk* and defendant's pending suppression motion. The court granted defense counsel's request, and Mr. Batchelder and the government submitted additional supplemental briefing after the September 24, 2012 conference. (ECF No. 47, Def.'s Supplemental Memorandum

Regarding *Voustianiouk*, dated 10/26/2012 ("Second Suppl. Mot.");

ECF No. 49, Gov't Opposition to Def.'s Supplemental Memorandum

Regarding *Voustianiouk*, dated 11/8/2012 ("Second Suppl. Opp.");

ECF No. 51, Def.'s Supplemental Reply Regarding *Voustianiouk*,

dated 11/14/2012 ("Second Suppl. Reply").)

       Thereafter, the parties appeared on November 14, 2012,

to continue the suppression hearing proceedings, to provide

defense counsel with an opportunity to examine Agent Raab

regarding his knowledge of defendant's apartment number, and to

present testimony of Ms. Klishina, the neighbor whose daughter

was purportedly interviewed by Agent Raab prior to the search at

issue.  (*See* Minute Entry dated 11/14/12.)  At the start of the

November 14th hearing, however, Mr. Batchelder requested an

adjournment based on his need to engage a Russian-speaking

private investigator to help him develop evidence on Mr.

Bershchansky's behalf in connection with the pending suppression

motion, specifically with respect to interviewing Ms. Klishina,

whom Mr. Batchelder believed might require a Russian

interpreter.  (*Id.*)  Mr. Batchelder represented that he had

identified an appropriate investigator only a few minutes before

the November 14 hearing, and that Mr. Batchelder and his client

would be ready to proceed in a few weeks.  (*Id.*)  As a result,

the court again rescheduled the continued hearing date for

December 12, 2012, at 10:00 a.m.  (*Id.*)

**C.    The December 12, 2012 Continued Suppression Hearing**

The court held a continued hearing regarding defendant's motion to suppress on December 12, 2012.  (Minute Entry dated 12/12/2012.)  The court heard testimony from Agent Raab, Ms. Klishina, and Agent Steven Cerutti, concerning the issues regarding defendant's motion to suppress in the context of the *Voustianiouk* decision.

**1.    Testimony of Svetlana Klishina**

Ms. Klishina, who testified without the assistance of a Russian-language interpreter, although the court provided for an interpreter to assist her at the hearing, stated that she and her family had resided in the apartment known as "Apartment 2" of 2462 since 2003, that defendant and his mother moved into their apartment at 2462 Gerritsen Avenue sometime in 2010, and that she did not know either the defendant or his mother before they moved in.  (Transcript of Continued Suppression Hearing held on 12/12/2012 ("Tr."), at 3, 7.)  Ms. Klishina identified the photographs marked as government's Exhibits 2-B and 2-C as depicting the door to her apartment, (Tr. at 21-22), and identified her apartment as the door "upstairs to the left" in the photograph marked as government's Exhibit 2-A, (*id*. at 8).

Ms. Klishina testified that the entrance to her apartment is to the left as a viewer faces 2462 Gerritsen Avenue, which is a two-story building with a basement apartment,

a "ground floor" apartment, and a second floor apartment. (*Id.* at 6.) Ms. Klishina said defendant's apartment was the basement apartment, and her apartment was the "ground floor" apartment. (*Id.*) Ms. Klishina also testified that another family occupied the second-floor apartment of 2462 Gerritsen Avenue, but that apartment was not accessible from Gerritsen Avenue, and instead had a separate entrance on a different street around the corner. (*Id.* at 6-8.)

With respect to the appearance of the door to Ms. Klishina's apartment, Apartment 2, Ms. Klishina testified that there is a number "2" on an external screen door of the doorway to her apartment, which, as depicted in government's Exhibit 2-B, must be opened to reach the internal door to her apartment. (*Id.* at 21.) The screen door bears a few political stickers, which were not present at the time the search at issue was executed on January 31, 2011. (*Id*. at 21-22.) The number "2462" also appears to the right on the wall of the building, next to the screen door of Ms. Klishina's apartment, but "2462" does not appear on the internal door of apartment 2. (*Id*. at 22 (referring to Gov. Ex. 2-C).) There is, however, a number "2" prominently located on the internal and external doors to Ms. Klishina's apartment. (*Id.* at 27.)

Ms. Klishina stated that in approximately December 2010 or January 2011 she overheard a conversation between her

then-teenage daughter and law enforcement agents occurring at the doorway of her apartment, Apartment 2. (*Id.* at 4.) According to Ms. Klishina, two FBI agents knocked on the door of her apartment that morning and asked her daughter if a man named "Kim" lived in their apartment. (*Id.*) Ms. Klishina testified that her daughter told the agents that no such person lived in the apartment. (*Id.*) Ms. Klishina testified that the agents then asked about the identities of the residents of the apartment, and Ms. Klishina's daughter replied that she lived in the apartment along with her mother and her stepfather. (*Id.*) The agents then asked Ms. Klishina's daughter if she knew who lived in the other two apartments located at 2462 Gerritsen Avenue, and Ms. Klishina's daughter told them that "downstairs live a mother with a son, and upstairs [a] Spanish-speaking family." (*Id.*)

### 2. Testimony of Agent Raab

Agent Raab testified that he was the case agent in the investigation of defendant that preceded the execution of the search warrant at issue on January 31, 2011. (*Id.* at 33.) As case agent, Agent Raab met with an Assistant United States Attorney prior to drafting the supporting affidavit, admitted as government's Exhibit 1, and signed the supporting affidavit after reviewing it and believing it to be accurate. (*Id.* at 36-37; *see also* Supporting Affidavit.) Agent Raab's supporting

affidavit dated January 24, 2011 contains the same description
of the premises to be searched as the search warrant at issue:

> The SUBJECT PREMISES is an apartment located
> within a two-story red brick multi-family
> dwelling, which is attached on one side.
> The front of the dwelling has two exterior
> doors.  The door to the left leads upstairs
> to apartment #1.  The door to the right as
> you face the building leads to the SUBJECT
> PREMISES.  The door is brown and bears the
> number "2462 2".

(Supporting Aff. ¶ 4; Search Warrant at 1.)

Agent Raab testified that when he signed the
supporting affidavit on January 24, 2011, he was not aware that
it contained any errors.  (Tr. at 37.)  Agent Raab presented the
supporting affidavit and the warrant to Magistrate Judge Azrack
on January 24, 2011; he testified that he does not recall any
substantive conversation occurring between himself and
Magistrate Judge Azrack prior to Judge Azrack signing the
warrant.  (*Id*. at 37, 121-22.)  Agent Raab also testified that
he did not photograph the premises located at 2462 Gerritsen
Avenue and was not aware of anyone else photographing of the
location, either before, during, or after the search was
executed.  (*Id*. at 38.)

Agent Raab identified the photograph marked as
Exhibits 2-A as depicting the building located at 2462 Gerritsen
Avenue.  (*Id*. at 39-40.)  He also testified that he has no
independent recollection of the appearance of 2462 Gerritsen

16

Avenue apart from the description written in his supporting affidavit. (*Id.* at 40.)  Nonetheless, Agent Raab acknowledged that when comparing the photograph marked as government's Exhibit 2-A, which depicts the two doors at 2462 Gerritsen Avenue, to the description of the premises to be searched in his supporting affidavit, the supporting affidavit's erroneously stated that "the door to the left leads upstairs to apartment 1," because the door to the left above the exterior stairs has a number 2 on the door.  (*Id.* at 40-41.)[6]

When shown the photograph marked as government's Exhibit 2-E – a photograph of the inner door to defendant's apartment, marked with a "1," *i.e.*, "the door to the right" described in the supporting affidavit and the search warrant – Agent Raab also testified that the "door to the right" is brown in the photograph, which comports, in part, with paragraph 4 of the supporting affidavit.  (*Id.* at 41.)  He further testified, however, that assuming Exhibit 2-E depicts the "door to the right" as it appeared on the date of the January 31, 2011 search, the supporting affidavit incorrectly states that the brown door to the right "bears the number 2462 2," (*id.* at 41-42), because the door to the right actually has stickers, depicting the number 2462, and a large number "1" on it, (*id.* at

---

[6] Government Exhibits 2-A through 2-E are photographs of the premises and the doors of apartments 1 and 2 that were taken after the search and submitted to the court by defense counsel.  (Tr. at 11.)

41). Agent Raab stated that he was not aware of this error when he signed the supporting affidavit. (*Id.* at 41-42.) Agent Raab also testified that, assuming Exhibit 2-E depicts the "door to the right" as it appeared on the date of the January 31, 2011 search, he did not recall whether the "door to the left" had a number "1" or a number "2" on it. (*Id.* at 44.)

Agent Raab also testified regarding the documents concerning the premises to be searched that were referenced in his supporting affidavit. Specifically, paragraph 19 of Agent Raab's supporting affidavit states that he determined that Cablevision was the cable provider holding the registration of the IP address sought in connection with the child pornography files previously described. (Supporting Aff. ¶ 19.) Paragraph 19 of his supporting affidavit further states "in response to an administrative summons," Cablevision informed Agent Raab that, during the relevant time period, the subscriber to the subject IP address was "Yuri Bershchansky of 2462 Gerritsen Avenue Apartment 2, Brooklyn, New York 11229. The account provides Internet access to/from the address of 2462 Gerritsen Avenue Apartment 2, Brooklyn, New York 11229." (*Id.*) At the continued suppression hearing on December 12, 2012, Agent Raab also identified the Cablevision records that comprised Cablevision's response to his administrative summons as Government Exhibit 3, which he received on January 13, 2011. (Tr. at 46-48.)

Cablevision's response dated January 13, 2011 also states that the subscriber was "Yuri Bershchanky," at "2462 Gerritsen Av., Apt. 2, Brooklyn, New York 11229." (Tr. at 48; Gov. Ex. 3.)

Agent Raab's supporting affidavit also relied on oral information obtained from Con Edison. Paragraph 20 of Agent Raab's Supporting Affidavit provided that, "[o]n January 19, 2011, [Agent Raab] confirmed with Con Edison that the bill for the subject premises is in the name of Yuri Bershchansjy [sic]." (Supporting Aff. ¶ 20; Tr. at 50-51.) On direct examination, Agent Raab testified that he obtained this information by calling a hotline Con Edison makes available to law enforcement agencies. (Tr. at 51.) While he did not specifically recall the conversation he had more than two years earlier with the Con Edison representative, Agent Raab stated during his direct examination that "[t]he substance of what I was told was that the address – the account for the address [Apartment 2] came back to Yuri Bershchansky." (*Id*. at 51-52; *see also id*. at 52 ("The Court: When you say address, what address are you talking about, Apartment 1 or Apartment 2? The Witness: Apartment 2.").)

On cross examination of Agent Raab by defense counsel, however, the following questions were asked and answered on this topic:

19

> **Q:** I'm asking you to explain [the] language
> [found in the supporting affidavit], ["]the
> affiant [confirmed] with Con Edison that
> bills for the subject premises [were] in the
> name of Yuri Bershchansky.["] Did they give
> you any indication as to the apartment Mr.
> Bershchansky was in?
>
> **A:** I don't recall the exact wording of how
> I put it to Con Ed.
>
> **Q:** All right. Did they say he was in
> apartment 2?
>
> **A:** No, I believe they gave the name Yuri
> Bershchansky.
>
> **Q:** Yuri Bershchansky is at [the] building
> of 2462 [Gerritsen] Avenue?
>
> **A:** They would just give the name. They
> wouldn't go into that. They just give you
> the name of the subscriber.

(*Id.* at 109-110.)

Although Agent Raab inquired whether a record of his call with Con Edison was available from Con Edison and from Homeland Security, neither entity was able to provide Agent Raab with a record. (*Id.* at 52.) The government also showed Agent Raab two bills from Con Edison during the relevant period admitted as government's Exhibit 5, the first describing "Svedlana Klishina [sic]" as the person associated with "2462 Gerritsen Ave 2FL," and the second describing "Yuri Berschansjy [sic]" as the person associated with "2462 Gerritsen Ave 1FL." (*Id.* at 53-54.) Agent Raab testified that he had not seen and did not rely on either of these Con Edison bills in his

affidavit at the time he applied for the search warrant.  (*Id.* at 54-55.)

In his supporting affidavit, Agent Raab further relied upon verbal information purportedly obtained from one of defendant's neighbors in drafting the supporting affidavit. According to the supporting affidavit, "[Agent Raab] also confirmed with the tenant living at 2462 Gerritsen Avenue Apartment 1 that 'Yuri and his mother live in Apartment 2.'  The tenant described Yuri as being approximately 30 years old and Russian."  (Supporting Aff. ¶ 20.)

Agent Raab testified that he and another HSI agent, Special Agent Steven Cerutti, spoke with another tenant at 2462 Gerritsen Avenue before Agent Raab signed the supporting affidavit.  (Tr. at 58, 60.)  With regard to Exhibit 2-A – the photograph depicting the two doors accessible from 2462 Gerritsen – Agent Raab testified that he and Agent Cerutti visited the apartment "on the left of the flight of stairs." (*Id.* at 56.)  He stated that they went to that apartment "to speak to a neighbor to try to determine who lived in the apartment, Mr. Bershchanksy's apartment."  (*Id.*)  Agent Raab testified that a teenage girl answered his knock on the door, and that he identified himself as an agent of Homeland Security Investigations.  (*Id.* at 60.)  Agent Raab testified that he did

not see the girl's mother or anyone else in the apartment from where he was standing at the threshold. (*Id*. at 60-61.)

Agent Raab testified that he told the girl who answered the door "that we wanted to speak to someone in the other apartment who had given us that as his address, and we wanted to ask her if he lived there." (*Id*. at 57.) Agent Raab testified that he did not recall the particular name he used for the purported individual under investigation, but believed he used "a name that sounded Asian" in his question because he and Agent Cerutti "wouldn't want to tell her that we were looking to speak to Mr. Bershchansky for fear that she would tell him that the police were asking for him." (*Id*. at 57.) According to Agent Raab, the girl responded that the "person whose name [the agents] used didn't live there, and she referred to us [*sic*] as Yuri and his mother living there." (*Id*. at 58.)

Despite not recalling the girl's "exact words," Agent Raab testified that his statement in the supporting affidavit that a tenant told him that the girl said "Yuri and his mother live in Apartment 2," is erroneous, although he was not aware of this mistake when he signed the affidavit. (*Id*. at 58.) In response to the court's questions, Agent Raab further clarified that he was not aware when he was speaking to the girl what apartment number she occupied. (*Id*. at 74.) Agent Raab also

testified that he did not remember the girl stating who lived in her apartment.  (*Id*. at 75.)

Agent Raab also testified about the government's Exhibit 7, the "Enforcement Operation Plan" ("EOP") for the execution of the search warrant at issue executed on January 31, 2011.  (*Id*. at 62-63.)  Agent Raab drafted the EOP "a day or so" before the search warrant was executed, and distributed it to the other agents who were going to take part in the search. (*Id*.)  The EOP's first page indicates that the "Location of Operation" was "2462 Gerritsen Avenue #2, Brooklyn, New York," (Gov. Ex. 7), because, as Agent Raab testified at the hearing, "that was the location that we were conducting the search warrant," (*id*. at 63-64).  The second page of the EOP lists "Yuri Bershchansky" as the name of the suspect, and the third page includes a picture of Mr. Bershchansky.  (Gov. Ex. 7).

Agent Raab further testified that when he and the other eight HSI agents executed the search at issue on January 31, 2011, he intended to search the "apartment to the right with the red awning down the stairs," as depicted in the government's Exhibit 2-A, and he believed that this was the apartment specified in the search warrant, *i.e.*, Apartment 2.  (*Id*. at 65-66.)  Agent Raab testified that he did not remember what the door of the apartment he searched looked like on the day of the search.  (*Id*. at 66.)  Agent Raab did not recall whether the

photographs marked as government's Exhibits 2-D and 2-E accurately depicted the screen door and internal door to Apartment 1 of 2462 Gerritsen Avenue, but agreed these photographs appeared to be of "the apartment to the right, down the stairs." (*Id.* at 67.)

Agent Raab also testified that none of the accompanying agents raised any concerns regarding whether the January 31, 2011 search was executed in the correct apartment. (*Id.* at 68.) When shown the phone records associated with defendant's cell phone obtained from AT&T, admitted as government's Exhibit 8, Agent Raab testified that Mr. Bershchansky called him numerous times that day after the search on January 31, 2011, beginning at 7:56 a.m., shortly after the agents left Mr. Bershchansky's apartment. (*Id.* at 69-71; Gov. Ex. 8.) At 7:57 a.m., defendant left a voicemail stating that he lived in Apartment 1, "not in Apartment Number 2, as it reads on the search warrant," for Agent Raab. (Tr. at 73; Gov. Ex. 8.) After receiving defendant's voicemail, Agent Raab contacted the U.S. Attorney's office, but did not return defendant's calls. (Tr. at 73.)

On cross examination by defense counsel, Agent Raab testified that, as the lead case agent on defendant's case, he was responsible for ensuring that the information reflected in the search warrant was accurate. (*Id.* at 77.) Agent Raab also

testified that he had served as the lead case agent several dozen times in his law enforcement career and participated in approximately fifty search warrant executions. (*Id.* at 78.) Agent Raab did not recall (i) whether he knew the number of the apartment at the top of the stairs that he visited prior to applying for the search warrant at issue; (ii) the appearance of the door of the upstairs apartment that he visited prior to applying for the search warrant, including whether it bore a number at all; (iii) whether, after speaking with the teenage girl in the upstairs apartment discussed earlier, Agent Raab viewed 2462 Gerritsen Avenue "with an eye towards how [the agents] were going to execute a warrant" there; (iv) writing "Apartment 2" into the search warrant; (v) why Agent Raab wrote "Apartment 2" in the search warrant; and (vi) why Agent Raab wrote "Apartment 2" in the EOP. (*Id.* at 78-84.)

Agent Raab testified that he did not recall the number of the apartment he and his team searched and did not recall what the front door of that apartment looked like either prior to or after the search was executed. (*Id.* at 94-96.) Nonetheless, Agent Raab testified that when he drafted the warrant and had it signed by Magistrate Judge Azrack, he knew that the warrant was directed to Apartment 2, despite the fact that he had been to the premises known as 2462 Gerritsen Avenue on one previous occasion. (*Id.* at 97.)

Agent Raab testified on cross examination that he did not rely at all on the phone records of defendant's cell phone admitted as government's Exhibit 8 in drafting the search warrant at issue. (*Id.* at 89.) Similarly, Agent Raab testified that he did not possess and did not rely upon the Con Edison bills admitted as government's Exhibit 5, discussed previously. (*Id.*)

Agent Raab also testified that, prior to applying for the search warrant, he did not obtain or make any effort to obtain a floor plan of the apartment he intended to search. (*Id.* at 91.) Agent Raab also testified that he did not undertake any additional investigation into whether Mr. Bershchansky lived in "apartment 2" after conversing with the teenage girl, as described above, but Agent Raab acknowledged that he inserted the girl's purported statement that defendant lived in Apartment 2 into the supporting affidavit. (*Id.* at 110-113.) Finally, Agent Raab stated that it would be his practice to inform his search team (i) whether the apartment to be searched was accessible through the door on the right or left of the front of the building, and (ii) the apartment number and street address of the residence. (*Id.* at 115-116.) But Agent Raab testified that he did not recall any specific words or instructions he may have given to the other HSI agents before executing the search warrant at issue (*id.* at 113-115).

### 3.    Testimony of Special Agent Steven Cerutti

Special Agent Steven Cerutti ("Agent Cerutti") was the final witness to testify at the continued suppression hearing on December 12, 2012.  Agent Cerutti is currently assigned to the Immigration and Customs Enforcement division of Homeland Security, but was assigned to the Child Exploitation group in January 2011 when the search warrant at issue was executed. (*Id.* at 130-31.)

Agent Cerutti testified that he accompanied Agent Raab on the day Agent Raab visited 2462 Gerritsen Avenue prior to executing the search warrant.  (*Id.* at 132.)  Agent Cerutti identified the government's Exhibit 2-A as depicting the two doors of the building located at 2462 Gerritsen Avenue accessible from 2462 Gerritsen Avenue.  (*Id.*)  Agent Cerutti testified that he and Agent Raab went to the door that was "furthest on the left, the one at the top of the stairs" as depicted on Exhibit 2-A.  (*Id.*)  After one of the agents knocked on that door, a young woman answered, and the agents identified themselves as agents with the Immigration and Customs Enforcement division of Homeland Security.  (*Id.* at 133.)  Agent Cerutti did not see anyone else inside the apartment, and no other residents came to the door while the agents spoke to the girl.  (*Id.*)

Agent Cerutti testified that he and Agent Raab "made
up a fictitious name, said that we were looking for this person,
just to find out who was living in the house, and we asked her
if that person lived there and she said no.  And [we] told her
we wanted to speak to him on an immigration matter, that
fictitious person." (*Id*. at 134.)  The agents used a fictitious
name because they did not "want to jeopardize the investigation
by letting people know who the subject of the investigation is.
. . . [A]t that point when we were knocking on the door, we
don't know if this person has a relationship with the subject or
if the subject even lives in that particular apartment." (*Id*.)

According to Agent Cerutti, the girl replied that the
person the agents were looking for did not live in her
apartment. (*Id*.)  Agent Cerutti further testified that "I
believe we asked about the apartment below, which is to the
right – as I'm facing the house, to the right and below, you see
a door there.  And she said that's somebody -- a Russian guy by
the name of Yuri lived there with his mother." (*Id*.)

Agent Cerutti was part of the search team that
executed the search warrant at issue on January 31, 2011. (*Id*.
at 135.)  He testified that a pre-search briefing occurred prior
to the search execution, and "there was no uncertainty as to
which apartment we were going to be executing the search warrant
at," which was "[t]he apartment that was to the right, the one

that was sort of below the street level, basement apartment."
(*Id.* at 135-136.) Agent Cerutti recalled that the search
warrant was passed around during the pre-search briefing, but he
did not recall if there was an apartment number displayed on the
search warrant. (*Id.* at 136.) Agent Cerutti further testified
that he did not consider entering the apartment upstairs and to
the left before the search, because "[a]t this point, it was
clear to me that we were going to knock on the door that was on
the right, looking at [Exhibit 2-A]." (*Id.* at 137.) Agent
Cerutti and the search team did, in fact, search the basement
apartment located "downstairs to the right." (*Id.* at 137.)

On cross examination by defense counsel, Agent Cerutti
testified that he did not notice the number of the apartment he
and Agent Raab visited prior to the search and that he "knocked
on the door . . . . [and] didn't pay attention to what number
was on there." (*Id.* at 138.) In response to the court's
question, Agent Cerutti stated that he and Agent Raab decided to
first visit the apartment upstairs to the left, as opposed to
the apartment downstairs on the right, because the former
"appeared to be the mini-entrance to the house. It was just a
place to start." (*Id.* at 143.) On the day of this pre-search
visit, Agent Cerutti stated that he and Agent Raab "had no idea"
who lived in the upstairs apartment, which was "precisely why we
went to knock on the doors there." (*Id.*) At this time, Agent

Cerutti did not have any "specific" information about Yuri Bershchansky, but he recalled "that an internet account came back to that address broadly. . . ." (*Id.* at 143.)

After speaking with the girl who answered the door of the upstairs apartment, Agent Cerutti did not rule out that the subject lived in the upstairs apartment; rather "when the young lady told us that Yuri lived downstairs, we just decided to leave it at that. That was just a decision that was made on the spot." (*Id.* at 144.) Agent Cerutti did not recall if he went down the stairs to look at the number on the apartment downstairs on the right after the pre-search discussion with the girl, but he confirmed that he was not asked to investigate the apartment numbers any further and did not do so. (*Id.* at 138-139.)

Agent Cerutti further testified that he had initiated the investigation into the defendant, and that he assisted Agent Raab with preparing the supporting affidavit accompanying the search warrant by providing Agent Raab with "material facts" and "information relating to the investigation I had conducted up to that point." (*Id.* at 139-140.) Agent Cerutti did not "fact check" Agent Raab's supporting affidavit, however, and did not provide Agent Raab with any information regarding the "subject premises" or the apartment numbers. (*Id.* at 139-140.)

### 4.  The Parties' Post-Hearing Submissions

The parties filed post-hearing submissions on February 4, 2013.  (ECF No. 55, Gov't Post-Hearing Memorandum in Opposition to Def.'s Motion to Suppress, dated 2/4/2013 ("Gov't Post-Hearing Mem."); ECF No. 56, Def.'s Post-Hearing Memorandum in Support of Def.'s Motion to Suppress, dated 2/4/2013 ("Def. Post-Hearing Mem.").)  On February 11, 2013, the government filed a response to defendant's post-hearing memorandum.  (*See generally* ECF No. 57, Gov't Response to Def.'s Post-Hearing Memorandum, dated 2/11/2013 ("Gov't Post-Hearing Resp.").)  Defense counsel did not file a response to the government's post-hearing memorandum dated February 4, 2013.

### DISCUSSION

### A.  Legal Standards

### 1.  Probable Cause

The Fourth Amendment, which prohibits "unreasonable searches and seizures," requires that "no Warrants shall issue, but upon probable cause, supported by Oath."  U.S. Const. amend. IV.  The United States Supreme Court explained in *Illinois v. Gates* that "probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules."  462 U.S. 213, 232 (1983); *see also United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008).  The Supreme Court

further stated that a magistrate judge's determination of whether probable cause exists requires "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

### 2. *Franks* Hearing

Defendant seeks a so-called *Franks* hearing in addition to his motion to suppress. Although "[t]here is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant," *Franks v. Delaware*, 438 U.S. 154, 171 (1978), a defendant may challenge the validity of a search warrant if he makes a "substantial preliminary showing" that the supporting affidavit contains deliberately or recklessly false or misleading information, *id.* at 155-56. *See also Falso*, 544 F.3d at 115 (same); *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000) (same).

In order to obtain an evidentiary *Franks* hearing, the defendant must make a substantial preliminary showing that (i) the warrant affidavit contains a false statement or material omissions that makes the affidavit misleading; (ii) the false statement or material omission was the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (iii) the false statement or material omission was integral or

necessary to the magistrate judge's probable cause finding.
*United States v. Martin*, 426 F.3d 68, 73-74 (2d Cir. 2005).  To
avoid "fishing expeditions into affidavits that are otherwise
presumed truthful . . . [a] challenger's attack must be more
than conclusory and must be supported by more than a mere desire
to cross-examine.  There must be allegations of deliberate
falsehood or of reckless disregard for the truth, and those
allegations must be accompanied by an offer of proof.  They
should point out specifically the portion of the warrant
affidavit that is claimed to be false; and they should be
accompanied by a statement of supporting reasons." *Falso*, 544
F.3d at 125-26 (internal quotation and citation omitted).  Thus,
"[t]he ultimate inquiry is whether, after putting aside
erroneous information and material omissions, 'there remains a
residue of independent and lawful information sufficient to
support probable cause.'" *Canfield*, 212 F.3d at 718 (quoting
*United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985)).

### 3.  The Search

The Fourth Amendment of the U.S. Constitution provides
that "no Warrants shall issue, but upon probable cause,
supported by Oath or affirmation, and particularly describing
the place to be searched, and the persons or things to be
seized."  U.S. Const. amend. IV.  The Fourth Amendment thus

requires that warrants state with particularity the place to be searched and the items that are to be searched and seized.

### a.    Scope of Search

To determine "the permissible scope of a search that has been authorized by a search warrant . . . [courts] must look to the place that the *magistrate judge* who issued the warrant intended to be searched, not to the place that the police intended to search when they applied for the warrant." *Voustianiouk*, 685 F.3d at 211 (emphasis added) (citing *Groh v. Ramirez*, 540 U.S. 551, 561 (2004) ("The mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope of the search should be as broad as the affiant's request.")); 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.5 (4th ed. 2004) ("One of the specific commands of the Fourth Amendment is that no warrants shall issue except those 'particularly describing the place to be searched.' Quite obviously, the primary purpose of this limitation is to minimize the risk that officers executing search warrants will by mistake search a place other than the place intended by the magistrate.").

In *Voustianiouk*, the Second Circuit held that agents exceeded the scope of the search authorized by a magistrate judge because the search warrant and accompanying affidavit "explicitly authorize[d] the search of the first-floor

34

apartment," but did *not* "mention . . . the second-floor
apartment" that agents searched or the suspect's name.
*Voustianiouk*, 685 F.3d at 211.  The search warrant in
*Voustianiouk* was issued for "the premises known and described as
2424 Cambreleng Avenue Apt. 1, Bronx, New York 10458."  *Id.* at
209.  The supporting affidavit[7] for the warrant in *Voustianiouk*
stated that the place to be searched was "a ground floor
apartment inside a two-story white shingled house," and that
"[b]ased in part on information obtained through a summons
directed to the internet service provider for [the] IP address"
under investigation, the investigator learned that "the
subscriber . . . was an individual at 2424 Cambreleng Avenue,
Apt. 1, Bronx, New York, 10458."  *Id*.  Neither the warrant nor
the supporting affidavit mentioned Voustianiouk's name.  *Id*. at
211.

When the search team in *Voustianiouk* arrived at the
defendant's premises on the day of the intended search, they
"rang both of the buzzers because neither were marked with an
apartment number.  After the officials rang the doorbells, they
saw a light turn on from the second floor window and then a man
came to the front door of the building.  The man was asked
whether he was Andrei Voustianiouk[,] and he confirmed that he

---

[7] Agent Raab, who drafted the supporting affidavit and warrant and conducted
the search in this case, also applied for a search warrant and was one of the
agents who conducted the search at issue in *Voustianiouk*.

was." *Id*. at 209-210. The lead agent recognized the defendant from a picture the agent had found of the defendant on the internet, and explained that the agents had a search warrant and needed to search the defendant's apartment. *Id*. at 210. The defendant then led the agents up to his second-floor apartment; the agents did not inform the defendant of the fact that the search warrant did not mention his name, or that the search warrant "clearly made reference to the downstairs apartment, not the one that he was leading [the agents] to on the second floor." *Id*.

The Second Circuit found that the agents in *Voustianiouk* had searched a location other than the one that the magistrate judge intended to be searched and deemed the warrant invalid. *Id*. at 211. The court further observed that "[s]uch a warrantless search, absent some exception, violates the Fourth Amendment *not because the description in the warrant was insufficient or inaccurate*, but rather because the agents executing the search exceeded the authority that they had been granted by the magistrate judge," *id.* at 212, i.e. to search "a ground floor apartment inside a two-story white shingled house" at 2424 Cambreleng Avenue Apt. 1, *id.* at 209 (emphasis added). *See also Horton v. California*, 496 U.S. 128, 140 (1990) ("If the scope of a search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant

exception from the warrant requirement, the subsequent seizure
is unconstitutional without more.").

### b. Particularity

The Fourth Amendment's demand that search warrants
"'particularly describ[e] the place to be searched' . . .
provides a 'limitation curtailing the officers' discretion when
executing the warrant,' so that 'the safeguard of having a
magistrate determine the scope of the search is [not] lost.'"
*Voustianiouk*, 685 F.3d at 211 (quoting *United States v. George*,
975 F.2d 72, 76 (2d Cir. 1992)).  This requirement traces
directly back to the Framers' experience with tyranny before
this Nation's founding: "The Fourth Amendment was a response to
the English Crown's use of general warrants, which often allowed
royal officials to search and seize whatever and whomever they
pleased while investigating crimes or affronts to the Crown. . .
.  The principal evil of the general warrant was addressed by
the Fourth Amendment's particularity requirement."  *Ashcroft v.
al-Kidd*, 131 S. Ct. 2074, 2084 (2011).

The Second Circuit held "that when officers search a
location other than the one that the magistrate judge intended
to be searched . . . there is no need to inquire into whether
the warrant's description was sufficiently particular to satisfy
the Fourth Amendment in order to determine if the search
violated the Constitution, because the search was conducted

without the authorization of a warrant.  Such a warrantless
search, absent some exception, violates the Fourth Amendment not
because the description in the warrant was insufficient or
inaccurate, but rather because the agents executing the search
exceeded the authority that they had been granted by the
magistrate judge." *Voustianiouk*, 685 F.3d at 212 (citing
*Horton*, 496 U.S. at 140).

        The Second Circuit has also held that "[p]articularity
concerns frequently arise in circumstances where the description
in the warrant of the place to be searched is so vague that it
fails reasonably to alert executing officers to the limits of
their search authority . . . or where the place described in the
warrant does not comport with the place confronting officers
when they attempt execution." *United States v. Clark*, 638 F.3d
89, 94 (2d Cir. 2011) (internal citations omitted); *see also*
*Maryland v. Garrison*, 480 U.S. 79, 84 (1987) ("By limiting the
authorization to search to the specific areas and things for
which there is probable cause to search, the [Fourth Amendment's
particularity] requirement ensures that the search will be
carefully tailored to its justifications, and will not take on
the character of the wide-ranging exploratory searches the
Framers intended to prohibit.").

        The Fourth Amendment's particularity requirement is
satisfied "if the description is such that the officer with a

search warrant can, with reasonable effort ascertain and identify the place intended." *Voustianiouk*, 685 F.3d at 211 (quoting *Steele v. United States*, 267 U.S. 498, 503 (1925)). "Warrants have been upheld despite 'technical errors,' such as an incorrect street address, when the possibility of actual error is eliminated by other information, whether it be a detailed physical description in the warrant itself, supplemental information from an appended affidavit, or knowledge of the executing agent derived from personal surveillance of the location to be searched." *Velardi v. Walsh*, 40 F.3d 569, 576 (2d Cir. 1994). To determine whether a warrant with a partial misdescription satisfies the particularity prong of the Fourth Amendment, this court must examine two factors: (i) whether the description is sufficient "to enable the executing officer to locate and identify the premises with reasonable effort," and (ii) "whether there is any reasonable probability that another premise might be mistakenly searched." *Voustianiouk*, 685 F.3d at 212 (quoting *United States v. Turner*, 770 F.2d 1508, 1510 (9th Cir. 1985)).

It is settled in the Second Circuit that supplementary documents, including affidavits submitted to a magistrate judge to demonstrate probable cause, can particularize a warrant *only* when attached and incorporated into the warrant by reference. *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) ("[W]e may

no longer rely on unincorporated, unattached supporting documents to cure an otherwise defective search warrant."); *George*, 975 F.2d at 76 ("Resort to an affidavit to remedy a warrant's lack of particularity is only available when it is incorporated by reference in the warrant itself and attached to it."); *cf*. Groh, 540 U.S. 551, 557 (2004) (noting that "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents").  Therefore, "the Government cannot rely on language in a warrant simply referencing the underlying affidavit to satisfy the particularity prong of the Fourth Amendment; rather, it must attach the affidavit to the warrant and incorporate it by reference using 'deliberate and unequivocal language.'"  *United States v. Cohan*, 628 F. Supp. 2d 355, 363 (E.D.N.Y. 2009) (internal quotation omitted); *cf. United States v. Walker*, 534 F.3d 168, 172 n.2 (2d Cir. 2008) (finding supporting affidavit was incorporated and attached to warrant where warrant stated that supporting affidavit "is incorporated herein by reference" and magistrate had "initialed the [relevant] portion of the attached affidavit").

### 4.  Good-Faith Exception to the Exclusionary Rule

In order "'to safeguard Fourth Amendment rights,'" the Supreme Court has created "an exclusionary rule that, when

applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009) (citing *Weeks v. United States*, 232 U.S. 383, 398 (1914)).

It is black-letter law, however, that "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Id.* at 140 (citing *Gates*, 462 U.S. at 223). "[T]he exclusionary rule is designed to deter police misconduct . . . and the Supreme Court has held that when the police act in objectively reasonable reliance on a . . . search warrant, even if the warrant was issued in violation of the Fourth Amendment, the marginal or nonexistent benefits produced by suppressing evidence obtained as a result of that subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Voustianiouk*, 685 F.3d at 214-15. "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance." *George*, 975 F.2d at 77. Mere negligence on the part of government agents in executing a search warrant subsequently found to be invalid does not lead to suppression. *Herring*, 555 U.S. at 144 ("the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct"). In *Voustianiouk*, the Second Circuit noted that "when agents search a location other than the one a magistrate judge intended for them to search, the warrant's description may still be important for the purpose of

determining whether the agents reasonably relied on the description in conducting a search and thus whether the exclusionary rule should be applied." *Voustianiouk*, 685 F.3d at 212 n.1.

## 5. Custodial Interrogation

Under *Miranda v. Arizona*, the Fifth Amendment protection against self-incrimination requires that "any information elicited by the police as the result of custodial interrogation of a suspect may not be introduced into evidence against him unless he has just been advised of and has waived certain basic constitutional rights." *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112 (2d Cir. 1975); *see Miranda v. Arizona*, 384 U.S. 436, 467-69 (1966). *Miranda* warnings, however, apply only to "custodial interrogation." *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004). There is no dispute here that the agents' interview of defendant was an "interrogation," which is defined as "express questioning or its functional equivalent." *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011) (citation omitted). Rather, the dispute concerns whether defendant was "in custody" when he made incriminating statements to the HSI agents on January 31, 2011.

The test for whether an individual is in custody is an objective one, based on "whether a reasonable person [in the suspect's position] would have thought he was free to leave the

police encounter at issue.  If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights."  *Georgison v. Donelli*, 588 F.3d 145, 156 (2d Cir. 2009) (internal quotation marks omitted).  If a reasonable person would not have thought himself [or herself] free to leave, the court must also ask whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest."  *Newton*, 369 F.3d at 672.  In determining whether the defendant was in custody, the court should consider "the circumstances surrounding the [interrogation,]" such as the interrogation's duration, its location, whether the suspect volunteered for the interview, whether the officers used restraints, whether weapons were present or drawn, and whether officers told the suspect he was free to leave or under suspicion.  *FNU LNU*, 653 F.3d at 153.  Moreover, "absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."  *Newton*, 369 F.3d at 675; *see also United States v. Mitchell,* 966 F.2d 92, 99 (2d Cir. 1992) (holding that defendant was not in custody where, among other things, the entire interview occurred in the "familiar surroundings of [the defendant's] home")

**B.     Analysis**

### 1. Probable Cause

The first issue before the court is whether the
government has adequately shown probable cause in this case that
contraband or evidence of a crime would be found in a particular
place to obtain a search warrant.  Defendant argues that "[a]
description of the files containing child pornography downloaded
from multiple sources other than Mr. Bershchansky's computer and
identity of its' [sic] digital signature with digital signatures
found in Mr. Bershchansky's computer does not establish probable
cause to believe the child pornography would be found in the
residence."  (Mot. ¶ 17.)  Defendant asserts that probable cause
to believe that evidence of possession of child pornography was
stored on his computer could only be established by actually
downloading child pornography from Mr. Bershchansky's computer.
(Mot. ¶ 20.)

Defendant's argument is unavailing.  Based on all the
circumstances set forth in Agent Raab's affidavit supporting the
search warrant application, there was probable cause to believe
that evidence of possession of child pornography would be found
by searching defendant's apartment, mistakenly identified as
apartment 2.  Specifically, the supporting affidavit stated that
an HSI investigator located files being hosted for peer-to-peer
sharing from IP address 24.185.53.197 with file names "known to

be associated with child pornography images and videos."
(Supporting Aff. ¶ 15.)  The investigator "direct connected" to
the computer at IP address 24.185.53.197 and found files offered
for download with titles that were "indicative of child
pornography." (*Id.* ¶ 16.)  The supporting affidavit listed the
titles of three video files available for sharing from the
computer at IP address 24.185.53.197 that were indicative of
child pornography. (*Id.* ¶ 16.)  The investigator subsequently
downloaded from other sources files with the identical SHA1
value, or digital fingerprint, for each of the files identified
as indicating child pornography. (*Id.* ¶ 17.)

The affiant, Agent Raab, personally viewed three of
the video files with the SHA1 values identical to the video
files shared from the computer at IP address 24.185.53.197 and
confirmed that they contained graphic images of child
pornography, as vividly described in his affidavit. (*Id.* ¶ 17.)
Law enforcement officers traced IP address 24.185.53.197 to an
account holder at defendant's residence. (*Id.* ¶ 20.)  Special
Agent Raab's supporting affidavit described his training and
experience with investigations relating to child pornography.
(*Id.* ¶ 1.)  His affidavit described how peer-to-peer file
sharing networks operate and how law enforcement can use keyword
searches to identify and download from those networks video and
image files containing child pornography. (*Id.* ¶¶ 6-10.)  The

affidavit also explained the origin of SHA1 values, and stated
that these values can be used to determine with 99.9999 percent
certainty whether two files are the same or not. (*Id.* ¶¶ 11-
12.)

Although the Second Circuit has not directly addressed
the reliability of SHA1 values, numerous courts have concluded
that SHA1 values constitute a reliable basis on which to find
probable cause that a computer contains images of child
pornography even where the files have not been opened and viewed
directly on a defendant's computer. *See, e.g.*, *United States v.
Oliverius*, No. 11-cr-3029, 2011 U.S. Dist. LEXIS 110783, at *11
(D. Neb. Aug. 5, 2011) (citations omitted) ("Given the accuracy
and reliability of SHA1 signatures," a magistrate judge may find
that an individual's computer contains images of child
pornography, "even if the affiant officer has not opened and
viewed the files on (and using) the defendant's computer, and
has not viewed files downloaded directly from that computer.");
*United States v. Beatty*, 437 F. App'x 185, 186-88 (3d Cir. 2011)
(finding a sufficient showing of probable cause where officer
did not open and view the suspect files, but explained the file
retrieval process, provided the names of suspect files, and
cross-referenced and matched each file's SHA1 value to known
child pornography files contained in a database maintained by
the Wyoming Internet Crimes Against Children Task Force); *United*

*States v. Miknevich*, 638 F.3d 178, 184 (3d Cir. 2011) (holding
that although the investigating officer never viewed the alleged
images of child pornography on the defendant's computer, the
warrant application provided sufficient probable cause where the
highly descriptive names of the file contents indicated child
pornography and the SHA1 values for those files matched SHA1
values of files known to contain child pornography); *United
States v. Righter*, No. 11-cr-3019, 2011 U.S. Dist. LEXIS 71412,
at *6 (D. Neb. May 19, 2011), *adopted by* 2011 U.S. Dist. LEXIS
69077 (D. Neb. June 21, 2011) (finding sufficient probable cause
where: "As of December 30, 2010, over 300 files were advertised
as available from the computer at IP address 76.84.231.144.  The
warrant application lists, by name, four of these files, and the
names listed are highly indicative of child pornography images.
Investigator Donahue used P2P sharing software to download the
four files from other peer computers on the Gnutella file-
sharing network.  All four videos were visually reviewed, at
least two of which were reviewed by Investigator Donahue
himself.  The videos depicted child pornography.").

Defendant's reliance on *United States v. Falso*, 544
F.3d 110 (2d Cir. 2008), to support his argument that probable
cause was lacking is misplaced.  In *Falso*, the Second Circuit
found that a supporting affidavit lacked probable cause where it
stated that the defendant's e-mail address had been identified

47

on a list of possible visitors to a website that contained eleven images of child pornography and offered a membership to obtain additional child pornography. *Id.* at 114. The affidavit stated that, based on the investigation, "it appeared that Falso either gained access or attempted to gain access to the non-member website www.cpfreedom.com." *Id.* (internal quotation marks and brackets omitted). The court reasoned that "[e]ven if one assumes (or infers) that Falso accessed the cpfreedom.com site, there is no specific allegation that Falso accessed, viewed, or downloaded pornography" where the affidavit did not indicate whether the images of child pornography were prominently displayed on the website or required an additional click of the mouse. *Id.* at 121. The affidavit in *Falso* did not rely on the SHA1 values of any files, and the court did not address whether cross-referencing such values to known child pornography files would be sufficient to establish probable cause.

In contrast, the investigator in this case browsed a list of shared files that were on defendant's computer and viewed file names indicating that the files contained child pornography. (Supporting Aff. ¶¶ 15-20.) The investigator then cross-referenced the unique SHA1 values of those files with files obtained elsewhere, and Agent Raab confirmed that the files offered for sharing by defendant did contain child

48

pornography. (*Id.* at ¶¶ 17-18.) This provided more than a substantial basis for Magistrate Judge Azrack's finding that the search warrant was supported by probable cause.

Defendant's claim that "to date, there is no evidence showing that those particular video files that allegedly gave reason for the search warrant were ever recovered or identified during the search" is mistaken. (*See* Reply ¶ 16.) To the contrary, the government asserts that "these same files [that the investigator observed on defendant's computer] were found in the subsequent search of the computer, which confirms that the browsing of the list of Bershchansky's shared files provided an accurate representation of some of the child pornography on Bershchansky's computer." (Opp. at 26.) Accordingly, defendant's motion to suppress based on the warrant's alleged lack of probable cause is denied.

### 2. *Franks* Hearing

The second issue before the court is whether the defendant is entitled to a *Franks* hearing because Agent Raab allegedly acted deliberately or recklessly to omit information from his supporting affidavit in support of the search warrant, and thereby knowingly misled Magistrate Judge Azrack. (Mot. ¶ 29.) Specifically, defendant argues that the affidavit (i) "omit[ted] how the investigative resources described by SA Raab were connected to the files [sic] names known to be associated

49

with child pornography, as well as how such files were related to the IP address 24.185.53.197" (*id.* ¶ 28); and (ii) "omitted . . . important information [about] whether the investigator could download and actually had downloaded files containing child pornography allegedly offered for download by Mr. Bershchansky," (*id.* ¶ 27). Thus, defendant contends, "the investigation results showed no actual presence of files containing child pornography" in Mr. Bershchansky's computer. (*Id.* ¶ 29.)

Contrary to defendant's argument, Agent Raab's supporting affidavit did explain how the file names browsed on defendant's computer were indicative of child pornography based on file names, and, further, were connected to and had SHA1 values identical to the files the investigator downloaded from other sources and confirmed contained child pornography. (Supporting Aff. ¶¶ 15-20.) In particular, the affidavit explained that the investigator directly connected to the defendant's computer, with IP address 24.185.53.197, and browsed files with titles indicative of child pornography that that computer offered for sharing. (*Id.* ¶¶ 15-16.) The affidavit then explained that the investigator downloaded files from other sources with the identical SHA1 values as the files viewed on defendant's computer and thereby verified that the files on defendant's computer contained images depicting child pornography. (*Id.* ¶ 17.) It is clear from the affidavit that

Special Agent Raab sought the search warrant based on the verification of those files' SHA1 values, and not on any downloads from defendant's computer. (*Id.* ¶¶ 15-18.)

Further, as previously explained, downloading is not necessary for a finding of probable cause. It is sufficient that the investigator viewed titles of files located on defendant's computer, cross-referenced those files with other known files using the files' unique SHA1 values, and verified that the files located on defendant's computer contained images depicting child pornography.

Defendant also challenges the investigator's reliance on the files' SHA1 values to confirm that they did, in fact, depict child pornography. He claims that it was misleading for the agent to describe the SHA1 value as a digital "DNA" or "fingerprint," arguing that the SHA1 value is no more than a label that does not actually indicate what is inside, much as a bag labeled with a drug's chemical formula would not necessarily contain the drug itself. (Reply ¶¶ 4-12.) Defendant's contention is meritless. As numerous courts have found, SHA1 values are sufficiently accurate as to form a reliable basis on which a court may find that there is probable cause to believe that contraband or evidence of a crime will be found in a particular place. *See, e.g.*, *Oliverius*, 2011 U.S. Dist. LEXIS

110783, at *11 (noting "the accuracy and reliability of SHA1 signatures").

Accordingly, because defendant has not made a substantial preliminary showing that Magistrate Judge Azrack was knowingly misled about any facts material to the search warrant, the court finds no basis for a *Franks* hearing, and defendant's motion to suppress based on the supporting affidavit's allegedly false statements is denied.

### 3. The Search

#### a. Scope of Search

The third issue before the court is whether the government agents conducted a search in violation of the Fourth Amendment because they allegedly searched a premises other than the one that Magistrate Judge Azrack intended to authorize them to search.

Under the Second Circuit's reasoning in *Voustianiouk*, this court "must look to the place that the magistrate judge who issued the warrant intended to be searched, not to the place that the police intended to search when they applied for the warrant." *Voustianiouk*, 685 F.3d at 211. Because the search warrant in this case was directed to the "subject premises," this court must address the question of what premises the magistrate judge intended and authorized the government agents to search.

The search warrant approved by the magistrate judge authorized the search of "the premises known and described as 2462 Gerritsen Avenue, Apt. #2, Brooklyn, NY 11229," and contained the following definition for the "subject premises" that were authorized for the search:

> The SUBJECT PREMISES is an apartment located within a two-story red brick multi-family dwelling, which is attached on one side. The front of the dwelling has two exterior doors. The door to the left leads upstairs to apartment #1. The door to the right as you face the building leads to the SUBJECT PREMISES. The door is brown and bears the number "2462 2."

(Search Warrant at 1.)

Defendant argues that Magistrate Judge Azrack signed a warrant directed only to Apartment 2 of 2462 Gerritsen Avenue, and that there is no indication that she intended to authorize the search of any other apartment in the building. (Def. Post-Hearing Mem. at 5-7.) Defendant correctly points out that the warrant in this case, like the warrant in *Voustianiouk*, did not bear the defendant's name either as a potential suspect or as a potential occupant of the subject premises. (*Id*. at 6, 9.)

Second, Defendant also correctly points out that Agent Raab's averments in the supporting affidavit all reference Apartment 2 as the subject premises, *not* Apartment 1. (*Id*. at 6-7.) Agent Raab's supporting affidavit cited (i) documents from Cablevision, which indicated that the particular IP address

53

Agent Raab was investigating was associated with subscriber Yuri Bershchansky, at "2462 Gerritsen Avenue Apartment 2"; (ii) information received from Con Edison indicating that the bill for the "SUBJECT PREMISES" was in Mr. Bershchansky's name; and (iii) a conversation the affiant had with the neighbor living in "2462 Gerritsen Avenue Apartment 1," in which the tenant allegedly stated that "Yuri and his mother live in apartment 2." (Supporting Aff. ¶¶ 19-20.)

The government counters that there are two key differences between this case and *Voustianiouk*. First, the government argues that Agent Raab's supporting affidavit in this case, unlike the supporting affidavit in *Voustianiouk*, *correctly* described the apartment that was to be searched as "an apartment located within a two-story red brick multi-family dwelling, found through the door to the right as you face the building," (Gov't Post-Hearing Mem. at 8-9 (quoting Supporting Aff. ¶ 4)). The government further asserts that "[a] clear contrast was drawn between the apartment upstairs to the left and the apartment downstairs to the right." (*Id.*) The government also notes that the supporting affidavit for the warrant in *Voustianiouk* described the premises to be searched as the "ground floor apartment," even though the agents in that case went on to search an *upstairs* apartment. (*Id.* at 8 (citing *Voustianiouk,* 685 F.3d at 209).) Unlike in *Voustianiouk*,

however, the affidavit and search warrant here provided that the apartment to be searched was apartment 2 and made no reference to defendant's apartment being "downstairs."

Second, the government argues that Agent Raab's supporting affidavit in this case, unlike the supporting affidavit in *Voustianiouk,* "makes clear that the apartment to be searched is the one in which the target 'Yuri Bershchansky' resided." (*Id.* at 9.) Specifically, Agent Raab's affidavit in this case stated (i) that Cablevision had advised that the subscriber to the IP address that agents had connected to child pornography was "Yuri Bershchansky of 2462 Gerritsen Avenue Apartment 2, Brooklyn, New York 11229," (Supporting Aff. ¶ 19), (ii) that the Con Edison bill for the "subject premises," described in part as apartment 2, was in the name of "Yuri Bershchansjy [sic]," (*id.* ¶20), and (iii) that a tenant residing at "2462 Gerritsen Avenue Apartment 1" had stated that "Yuri and his mother live in apartment 2," (*id.*). Thus, the government argues, "after reading the Raab Affidavit, Magistrate Judge Azrack intended agents to search the apartment downstairs to the right, where Yuri Bershchansky resided, and agents in fact searched the apartment downstairs to the right, where Yuri Bershchansky resided." (Gov't Post-Hearing Mem. at 10.) The court disagrees that any of the foregoing references in Agent

Raab's affidavit mentioned that defendant's apartment was "downstairs."

The Second Circuit did not provide guidance on how to ascertain a magistrate judge's intent in *Voustianiouk*. *Voustianiouk*, 685 F.3d at 211. A magistrate judge, however, can only legally authorize the search of a place if the government has shown that there is probable cause to suspect that evidence of a crime will be found at that place. *Id.* at 214. This court thus assumes that Magistrate Judge Azrack in this case intended to authorize the search of the premises where the government had shown there was probable cause to find evidence of a crime. According to Agent Raab's affidavit, upon which Magistrate Judge Azrack relied in authorizing the warrant, the probable cause offered in support of the search was based on the government's accessing a computer network where the government identified an IP address associated with a specific computer, and then obtained circumstantial evidence that files listed on the computer contained child pornography. (Supporting Aff. ¶¶ 15-20.) The government then contacted Cablevision, the cable provider that held the registration for the IP address associated with the specific computer, and Cablevision provided the government with the name and billing address of the subscriber to that IP address, both of which Agent Raab in turn

provided to Magistrate Judge Azrack in his affidavit. (*Id.* ¶ 19.)

The specific apartment number provided by Cablevision and later included in the affidavit and search warrant was *not* accurate, as previously discussed, because defendant actually lived in apartment 1, not apartment 2. (Search Warrant at 1.) But the initial question under the Second Circuit's analysis in *Voustianiouk* is not whether the premises to be searched was described with sufficient particularity. *Voustianiouk*, 685 F.3d at 211. Instead, the initial question is whether Magistrate Judge Azrack intended to authorize the search of an apartment (i) described in part by reference to a specific apartment number, apartment 2, in the affidavit and search warrant, or (ii) described as the premises occupied by a specific Cablevision subscriber named only in the affidavit as occupying apartment 2, but not named in the warrant. In *Voustianiouk*, the government affidavit and warrant identified a specific street address for an unnamed subscriber, including a ground floor apartment designated as apartment 1 as the place to be searched for the computer with an IP address. *Id.* at 209. Here, the government affidavit included the name of the subscriber to a specific IP address, (Supporting Aff. ¶¶ 19-20), as well as a street address that included the description of an apartment "to

the right as you face the building" with a brown door that "bears the numbers 2462 2," (*id.* ¶ 4).

Given that the government's showing of probable cause in Agent Raab's affidavit derived from the identification of a specific computer's IP address at apartment 2, and a neighbor's purported statement that the defendant resided in apartment 2, this court finds that Magistrate Judge Azrack necessarily intended for the government to search apartment 2, and not a "downstairs" apartment as the government contends because neither the affidavit nor warrant refer to a "downstairs" apartment.  Indeed, it is not clear from Agent Raab's affidavit how he or the magistrate judge understood that defendant was associated with an apartment located through the door "to the right," much less "downstairs."  In this case, agents were authorized to search the premises of the Cablevision subscriber at apartment 2 because they had shown probable cause that (i) the computer with that IP address, and (ii) other evidence related to child pornography may be located at apartment 2. (Supporting Aff. ¶¶ 15-20.)  Therefore, the government was authorized to search apartment 2, but as in *Voustianiouk*, searched premises that the magistrate judge did not intend to be searched: the premises of defendant in apartment 1.

### b. Particularity

The fourth issue before the court is whether the warrant described the premises to be searched with sufficient particularity to satisfy the requirement of the Fourth Amendment.

Because this court holds that the agents in this case "search[ed] a location other than the one that the magistrate judge intended to be searched . . . there is no need to inquire into whether the warrant's description was sufficiently particular to satisfy the Fourth Amendment in order to determine if the search violated the Constitution, because the search was conducted without the authorization of a warrant." *Voustianiouk*, 685 F.3d at 212.

### 4. Good-Faith Exception to the Exclusionary Rule

The fifth issue for the court is whether evidence obtained as a result of the search executed by the government agents should be admitted pursuant to the good-faith exception to the exclusionary rule.

The defense argues that Agent Raab (i) failed to note the correct apartment number of the defendant's apartment despite visiting a neighboring apartment, (ii) failed to see that agents were entering Apartment 1 on the day of the search, instead of Apartment 2, and (iii) failed to notify the

Magistrate Judge about the incorrect apartment number provided in the affidavit and later included in the warrant.  (Def. Post-Hearing Mem. at 4-6.)

The government argues that the good-faith exception to the exclusionary rule should apply to the search warrant in this case because (i) Agent Raab allegedly did not realize "before the search that the warrant was wrong," and (ii) the totality of his conduct demonstrates that if there was an error, it was a 'technical error.'"  (Second Suppl. Opp. at 7.)  At the December 12, 2012 continued suppression hearing, Agent Raab testified that he believed the warrant was accurate and did not know the apartment number "might" be wrong until Mr. Bershchansky called him after the search.  (Tr. at 69-71.)  Consequently, the government asserts that there was no "opportunity" for Agent Raab to call a magistrate judge and have the warrant corrected because he did not realize the error until after the search was over.  (Second Suppl. Opp. at 15; Gov't Post-Hearing Mem. at 8-9.)  Thus, the government argues that the good-faith exception to the exclusionary rule would apply in this case, even if the court finds the warrant defective, because the good-faith exception applies when there is no improper conduct to deter. (Second Suppl. Opp. at 7.)

The government also argues that, in addition to obtaining records from Cablevision, Agent Raab "contacted Con

Edison and visited the defendant's neighbor to determine the precise location of the residence of Yuri Bershchansky." (*Id.* at 7.) In addition, the government incorrectly asserts that the warrant reflects "an accurate description of the subject premises as the apartment downstairs to the right resided in by Yuri Bershchansky." (Gov't Post-Hearing Resp. at 7-8.)

The first part of the court's analysis is whether the agents reasonably relied on the warrant's description of the premises in conducting a search of defendant's apartment.

As a preliminary matter, in the Second Circuit, "unincorporated, [and] unattached supporting documents [cannot] cure an otherwise defective search warrant." *See Rosa*, 626 F.3d at 64. A review of the warrant demonstrates that it does not contain the "deliberate and unequivocal language" required in this Circuit to incorporate Agent Raab's supporting affidavit. *Cohan*, 628 F. Supp. 2d at 363. The warrant only mentions the supporting affidavit as part of the boilerplate statement that Magistrate Judge Azrack was "satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant." (Search Warrant at 1.) The warrant's only attachment was "Attachment A," *i.e.*, a list of things and records to be seized at the subject premises. (*Id.*)

As other courts in this district have noted, "the Government cannot rely on language in a warrant simply referencing the underlying affidavit to satisfy the particularity prong of the Fourth Amendment." *Cohan*, 628 F. Supp. 2d at 363; *cf. Walker*, 534 F.3d at 172, 173 n.2 (finding supporting affidavit was incorporated and attached to warrant where warrant stated that supporting affidavit "is incorporated herein by reference" and magistrate had "initialed the [relevant] portion of the attached affidavit").

Second, the description of the premises in the search warrant was insufficient to enable the executing officer to locate and identify the premises with reasonable effort. On the one hand, the search warrant accurately described the premises to be searched as "an apartment located within a two-story red brick multi-family dwelling" that was accessible through "[t]he door to the right as you face the building." (Search Warrant at 1.) On the other hand, the search warrant also inaccurately described the "subject premises" as behind the door bearing "the number '2462 2.'" (*Id.*) An agent executing the search warrant could have chosen to search either defendant's apartment based on the physical description or the apartment occupied by Ms. Klishina behind "2462 2" because, although the affidavit named Mr. Bershchansky, (Supporting

Aff.), the search warrant itself did not name him, and referred to a specific apartment number, (Search Warrant at 1).

For the same reasons, the warrant did not describe the premises to be searched with sufficient particularity so that there was no reasonable probability that an incorrect premises might be accidentally searched. As explained, an agent could have reasonably understood that the apartment was to be searched was apartment 2, rather than the apartment behind the "door to the right as you face the building." (*Id.*) Because of this deficient and conflicting description of the place to be searched, the court finds that the warrant's description was not sufficiently particular such that "agents reasonably relied on the description in conducting a search." *Voustianiouk*, 685 F.3d at 212 n.1.

The second part of the court's analysis is to determine whether the benefits of suppressing evidence justify the substantial costs of exclusion. *Id.* at 214-15. The testimony in this case shows that Agent Raab included what appears to be a clearly erroneous statement in his affidavit to the magistrate judge when he averred that he "confirmed with the tenant living at 2462 Gerritsen Avenue Apartment 1 that 'Yuri and his mother live in Apartment 2.'" (Supporting Aff. ¶ 20.) Ms. Klishina, who lives in apartment 2, credibly testified that she only heard her teenage daughter tell agents that "downstairs

live a mother with a son." (Tr. at 4.) It would make no sense for Ms. Klishina's daughter, who lived in apartment 2, to tell Agent Raab that Mr. Bershchansky lived in apartment 2. (Tr. at 4.)

Agent Raab testified at the continued suppression hearing that he did not recall the exact words of Ms. Klishina's daughter, but he acknowledged the statement he attributed to her in his sworn affidavit was incorrect. (*Id.* at 58.) Agent Raab also testified that he was not aware of the number of the apartment in which apartment Ms. Klishina's daughter resided and did not remember her telling him the names of the other occupants of her apartment. (*Id.* at 74-75.)

Moreover, Agent Raab made another significant error on the day of the search when he did not recognize that the door to the apartment agents entered was clearly marked "1," (Gov. Ex. 2-E), and not "2462 2," as he had averred to Magistrate Judge Azrack in the supporting affidavit, (Supporting Aff.), and which was the address the warrant authorized him to search (Search Warrant at 1). Indeed, Agent Raab testified that he did not "recall what the apartment number -- the front door of the apartment number we went in, [or] what that door looked like," or any other details about the door on the day he and other agents executed the search warrant. (Tr. at 95.) Agent Raab further testified that at the pre-search meeting, the

Enforcement Operation Plan described apartment 2 and the agents reviewed the plan authorizing the search of apartment 2. (*Id.* at 62-65.) The evidence suggests that the officers ignored the warrant's clear authorization to search only apartment 2 and searched an apartment they were not authorized to search. These significant errors constitute the type of "conduct [that is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the paid by the justice system." *Voustianiouk*, 685 F.3d at 216 (citing *Herring*, 555 U.S. at 144). Consistent with *Voustianiouk*, suppression in this case is necessary "to compel respect for the constitutional guaranty." *Id.* at 217 (quoting *Davis v. United States*, 131 S.Ct. 2419, 2426 (2011)).

Finally, the agents in this case did not take "every step that could be reasonably expected of them." *Id.* at 216 (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 989 (1984)). They could have read the warrant carefully and called the magistrate judge to obtain permission to search apartment 1, where defendant resided. Instead, they searched an apartment they were not authorized to search. The court thus finds that the good-faith exception to the exclusionary rule does not apply in this case and that evidence obtained pursuant to the search should be suppressed.

## 5. Custodial Interrogation

Although the court has already held that all evidence, including defendant's statements, obtained pursuant to the unauthorized search should be suppressed in this case, this court will also consider whether defendant's statements to agents during the search of his apartment on January 31, 2011 should also be suppressed because he was not given a *Miranda* warning.

As an initial matter, the court notes that contrary to defense counsel's assertion, "defendant's state of mind during the interrogation" is not at issue here. (Reply ¶ 26.) Rather, the relevant inquiry is an objective one, asking "whether a reasonable person [in the suspect's position] would have thought he was free to leave the police encounter at issue." *Georgison*, 588 F.3d at 156.

Several undisputed facts in the record indicate that defendant was not in custody during the interrogation. First, defendant was questioned in the familiar surroundings of his own kitchen. *See Newton*, 369 F.3d at 675 (interrogation in one's home, without an arrest, "is generally not deemed custodial."); *see also Mitchell,* 966 F.2d at 99 (holding defendant was not in custody in part because defendant was interviewed in his home). Second, defendant was permitted to get dressed prior to the interview. *See United States v. Pollaro*, 733 F. Supp. 2d 364,

371 (E.D.N.Y. 2010) (finding defendant was not in custody in part because he was permitted to shower and dress during the search); *see also United States v. Lifshitz*, No. 03 Cr. 572, 2004 U.S. Dist. LEXIS 18571, at *5, *20-21 (S.D.N.Y. Sept. 10, 2004) (finding defendant was not in custody even though he was told to wait when he sought permission from law enforcement agents to get dressed and smoke a cigarette).  Third, the agents allowed defendant's mother to remain in the apartment and to leave as she wished. *See, e.g.*, *Pollaro*, 733 F. Supp. 2d at 371 (interrogation was not custodial where defendant's wife moved freely about the house and at one point interrupted the interrogation to invite the group to come into the house from the garage).  Fourth, defendant was not arrested at the conclusion of the interview. *See, e.g.*, *United States v. Cunningham*, No. 5:11-CR-65, 2012 U.S. Dist. LEXIS 13183, at *16 (D. Vt. Feb. 3, 2012) (citing cases and noting that courts generally find the fact that a defendant was not arrested at the conclusion of the interview "weighs heavily in favor of finding the interrogation noncustodial").

There is a factual dispute regarding whether defendant was informed that he did not have to speak with the agents. Defendant's mother alleged that she "heard that the officer said [defendant] has to answer some questions."  (Bershchanskaya Aff. ¶ 19).  The government asserts, however, that prior to the

interview, the agents "advised [defendant] that he was not under arrest, that he was under no obligation to speak with law enforcement and that he was free to leave" (Compl. ¶ 8; HSI Search Report; 5/14/12 Tr. at 104). Based on the search report and the credible testimony of Agent Raab on this point, the court finds that the government agents informed defendant he was not under arrest and was free to leave at the time of the search, factors establishing that defendant could not reasonably understand that he was in custody. *See Newton*, 369 F.3d at 676 (informing subject that he is not under arrest and is free to leave "is a fact that may be considered in assessing the extent to which a reasonable person would understand any restraints on his freedom to be comparable to those associated with a formal arrest").

The parties also dispute the number of officers involved in the questioning and the seating arrangement during the questioning. Defendant's mother stated that she saw him sitting in a chair in the middle of the kitchen, with two agents sitting right in front of him and one agent standing right behind defendant's chair. (Bershchanskaya Aff. ¶ 22.) The government's report, on the other hand, states that only two agents conducted the interview while the other agents searched the apartment. (HSI Search Report.) Based on the testimony and the search report, the court similarly finds that defendant was

68

questioned by two agents while other agents searched the premises.

Finally, the parties dispute whether defendant was restrained in any other way. Defendant's mother claims she saw him "being escorted by two officers to the kitchen, with one officer holding [defendant's] hands behind his back." (Bershchanskaya Aff. ¶ 18.) Although the government asserts that defendant was "not handcuffed or restrained in any way," (Opp. at 12), the government acknowledges that it "cannot exclude the possibility that an agent other than Special Agent Raab briefly held Bershchansky's hands behind him for officer safety when he was moved between rooms," (*id.* at 29).

The issue of whether agents physically restrained a defendant is generally a relevant factor in determining whether a reasonable person would feel free to leave. *See, e.g.*, *Pollaro*, 733 F. Supp. 2d at 371 (noting that agents "never put their hands on [defendant]" in finding interrogation not custodial). Even the use of handcuffs prior to an interrogation, however, does not automatically render the interrogation custodial. In *United States v. Nguyen*, for example, the district court rejected the defendant's claim that he was placed in custody when an agent handcuffed him prior to a search of his car. No. 2:05-CR-130, 2006 U.S. Dist. LEXIS 55315, at *25-26 (D. Vt. Aug. 7, 2006). The court noted that

the period between the handcuffing and defendant's formal arrest was brief, and the defendant was informed that he was not under arrest and was being handcuffed "merely in order to prevent flight and obstruction of justice and to ensure the agents' and [defendant's] own safety." *Id.* Accordingly, to the extent that defendant's hands may have been held behind his back during the brief walk from his bedroom to the kitchen in order to protect the agents executing the search and conducting the interview, such a momentary restriction on defendant's freedom does not render the interrogation custodial.

The court finds that the questioning of defendant in his apartment was not done while the defendant was in custody and was thus permissible in the absence of a *Miranda* warning.

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress evidence seized and statements obtained pursuant to a search warrant executed on January 31, 2011, is granted.  The parties are to appear at a status conference at 10:30 a.m. on July 23, 2013.


**SO ORDERED.**


Dated: July 19, 2013
       Brooklyn, New York


                            _____  /s/_____ _____
                            KIYO A. MATSUMOTO
                            United States District Judge
                            Eastern District of New York